10 CV 7471

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELI WILAMOWSKY, | JURY TRIAL DEMANDED |
| Plaintiff, | |
| v. | |
| TAKE TWO INTERACTIVE SOFTWARE, INC., RYAN BRANT, TODD EMMEL, ROBERT FLUG, and OLIVER GRACE, | |
| Defendants. | |



**COMPLAINT**

1.      Plaintiff Eli Wilamowsky opted out of a class action denominated *In re Take-Two Interactive Secur. Litig.*, 06 Cv. 803 (RJS) (*see* Wilamowsky Notice of Exclusion attached as Exhibit A) and hereby files this individual action because the class action settlement plan of allocation specifically excluded short sellers, like Plaintiff, from receiving any money in the settlement. *See* Proof of Claim at 2 (attached as Exhibit B) ("Any person or entity that sold Take-Two common stock 'short' shall have no Recognized Loss with respect to any purchase during the Class Period or SEC Claims Period to cover such short sale.")

2.      Yet Plaintiff suffered injury from Defendants' misstatements. Indeed, this Court found in its April 16, 2008 decision (the "Decision," attached hereto as Exhibit C) that Defendants, with scienter, made materially false and misleading statements about option backdating that artificially inflated the value of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company") common stock throughout the period of December 17, 2002 and July 10, 2006, inclusive (the "Class Action Class Period"). *See* Decision at 3, 67-68.

3.      Between March 4, 2004 and July 16, 2006 (the "Individual Action Period"), Plaintiff sold Take-Two stock short. As a short seller, Plaintiff borrowed Take-Two stock and sold it under an obligation to buy the stock and deliver it back to its owner. Short sellers generally believe that a stock is overvalued and is slated to fall in value. However, short sellers, like Plaintiff, rely on the integrity of stock prices like any other investor.

4.      During the Individual Action Period, Take Two common stock *steadily* rose in price as a result of Defendants' misstatements. *See* Exhibit D hereto (chart of Take Two stock prices). In fact, after every one of Defendants' misstatements, Take-Two common stock immediately rose in price. *See infra* at ¶¶ 110, 114, 116, 120, 122, 126, 130, 134, and 138.

5.      In other words, the amount of artificial inflation in Take-Two stock continually increased during the Individual Action Period.  Thus, when Plaintiff bought Take-Two shares to cover his short position, he bought Take-Two shares at prices higher than those at which he sold, suffering harm.  Defendants' misstatements directly caused his loss since their consistent misstatements continually, and increasingly, inflated Take-Two's stock price during the Individual Action Period.

6.      The only part of this individual action not adjudicated in the Decision is the dynamic by which Plaintiff suffered harm – *i.e.*, Plaintiff alleges harm as a short seller.  As noted, this Court already found that Defendants made materially false and misleading statements, with scienter.

7.      Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief are based upon, among other things, the Decision, the second amended complaint filed in the class action, and the investigation conducted by Plaintiff's attorneys.

## II.   **NATURE OF THE ACTION**

8.      Plaintiff seeks compensation from Defendants for their violations of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as pendent state law claims.  As described below, throughout the Individual Action Period, Defendants issued, or caused to be issued, a series of statements that they knew, or were reckless in not knowing, were materially false and misleading, and failed to disclose material information necessary to render such statements not false and misleading.  Defendants' misrepresentations and omissions concerned the intentional backdating of stock options granted to its directors and senior management, which caused Take-Two's earnings to be overstated during the Individual Action Period by material amounts, as much as 20%.

34560v1                                    2

**Take-Two's History as Publisher of Controversial Video Games and Securities Fraud Recidivist**

9.     The Company has repeatedly violated the securities laws.  In late 2001, the Company acknowledged that it had overstated revenues back to 1999 through fraudulent product "parking" transactions and by failing to set aside adequate reserves for price concessions granted to customers, and in February 2002 restated its financial results for the prior two fiscal years (the "First Restatement").  The Company subsequently settled a private securities fraud action arising out of its revenue manipulation fraud, *In re Take-Two Interactive Software, Inc. Securities Litigation*, No. 01 Civ. 9919 (DLC) (S.D.N.Y. filed Dec. 18, 2001).

10.     In February 2004, Take-Two again restated its financial results (the "Second Restatement").  The Second Restatement was required to again correct improper revenue recognition practices, and the Company restated its revenues for five years, back to November 1998, virtually its entire life as a public company.

11.     Take-Two's revenue manipulation also prompted the SEC to commence a formal investigation into the Company, ultimately resulting in a civil enforcement action, *SEC v. Take-Two Interactive Software, Inc.*, No. 1:05-civ-5443 (DLC) (S.D.N.Y. filed June 9, 2005) (the "First SEC Action"), against the Company, its founder and former Chairman and Chief Executive Officer ("CEO"), Ryan Brant ("Brant"), and other senior Company executives.  The First SEC Action resulted in entry of a consent judgment against Take-Two (the "Consent Decree"), entered June 9, 2005, pursuant to which the Company paid a $7.5 million fine and agreed to be permanently enjoined from further violations of Section 10(b) of the Exchange Act and other provisions of the securities laws.  Under a separate consent decree, Brant agreed to disgorge more than $3.1 million in bonuses that were improperly awarded for achieving financial targets through the fraud, agreed to pay a $500,000 penalty, and agreed to be barred from serving

as a director or officer of any public company for five years.  Three other executives also agreed to repay illegally-obtained bonuses and pay penalties in the amounts of $1.7 million, $1.0 million and $110,000.

12.     Notwithstanding the entry of the consent decrees against them, Take-Two and Brant, together with other directors and officers of the Company, were engaged at the time such consent decrees were entered in further knowing and willful violations of Section 10(b) involving the backdating of stock options, which ultimately resulted in a third financial restatement, second SEC enforcement action, and the felony conviction by guilty plea of Brant, as discussed below.

**Defendants Made Materially False Statements About Take-Two's Stock Options**

13.     In violation of the Consent Decree, all of Take-Two's quarterly and annual financial statements, as reported on Forms 10-Q and 10-K, from its inception as a public company in 1997 were rendered materially false and misleading by the Company's practice of backdating and re-pricing employee stock options to provide illegal, windfall profits to senior executives and members of Take-Two's board of directors, including defendant Brant and other Individual Defendants (as defined below).

14.     On July 10, 2006, the last day of the Individual Action Period, the Company announced that it was the subject of an SEC investigation into possible options backdating, and that it had convened a special committee of its board of directors (the "Special Committee") to investigate options backdating at the Company.  As a result, Take Two stock fell almost 8%.

15.     In December 2006 and January 2007, Take-Two announced the conclusions of the Special Committee's internal investigation.  The Special Committee's report found, *inter alia*, that:

Between April 1997 and August 2003, Mr. Brant engaged in a pattern and practice of backdating options, and during such period, a significant number of option grants appear to have been backdated.

16.     The Special Committee also found that:

The Company, in granting options, failed in many cases to comply with the terms of its Stock Option Plans, did not maintain adequate control and compliance procedures for option grants, and did not generate or maintain adequate or appropriate documentation of such grants.  In addition, the Compensation Committee abdicated its option granting responsibilities and permitted [Brant] to control and dominate the granting process.

17.     On February 14, 2007, Brant pled guilty to a felony charge of falsifying business records in New York County Supreme Court and also settled civil charges brought by the SEC. Under the terms of his plea agreement and settlement with the SEC, Brant agreed to pay more than $7.2 million in disgorgement, interest and penalties.

18.     On February 23, 2007, Take-Two announced that options granted to several Company directors, including defendants Robert Flug ("Flug"), Oliver R. Grace, Jr. ("Grace"), and Todd Emmel ("Emmel"), were "improperly dated" and that each of the directors had entered into an agreement to repay the compensation that they had unlawfully obtained.

19.     On February 28, 2007, the Company issued a restatement of its financial statements, to account for the effect of illegal options backdating by Brant and others (the "Third Restatement").  The effect of the illegal backdating was highly material, resulting in an earnings overstatement of 20% in fiscal year 2002, 11% in fiscal year 2003, and 5-6% in fiscal years 2004 and 2005.

20.     On the same day, February 28, 2007, the Company filed a proxy statement for its annual meeting, to be held in March 2007, and presented a slate of six directors, three of whom, including defendants Flug and Grace, were among the directors who had acknowledged receiving improperly backdated options five days earlier.

21.     On March 29, 2007, the shareholders of Take-Two elected an alternate slate of directors presented by a group of institutional shareholders and the new board immediately terminated the Company's CEO, Paul Eibeler ("Eibeler").

22.     Thereafter, on April 5, 2007, Take-Two announced that the SEC had upgraded its investigation into options backdating at the Company to formal status.

23.     On April 9, 2007, Take-Two announced the resignation of its Chief Financial Officer ("CFO"), Karl Winters.

24.     Thereafter, in late May 2007, Take-Two's former general counsel, Kenneth Selterman and comptroller, Patti Tay, each pled guilty to Falsifying Business Records in the Second Degree in New York State Supreme Court.

25.     On April 16, 2008, this Court issued the Decision, which upheld Lead Plaintiffs' Exchange Act claims concerning options backdating.

## III.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa., and under 28 U.S.C. § 1367.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  The Company's corporate headquarters are located in New York, New York, and many of the acts and practices complained of in this Complaint, including the preparation and dissemination of materially false and misleading information, occurred in this District.

28.     In connection with the acts, transactions, conduct and other wrongs alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## IV.   PARTIES

29.     Plaintiff Eli Wilamowky bought Take-Two common stock during the Individual Action Period and suffered harm thereby.  Mr. Wilamowsky's certification is appended hereto as Exhibit E.

30.     Defendant Take-Two has executive offices in New York, New York and is organized under the laws of Delaware.  Take-Two has over 72 million shares issued and outstanding, which trade in an efficient market on the Nasdaq National Market ("NASDAQ").  Take-Two publishes, develops, and distributes interactive entertainment software, hardware, and accessories.  It also manufactures and markets video games and video game accessories in Europe, North America and the Asia Pacific region.  Take-Two sells its software titles in retail outlets in North America and Europe through direct relationships with major retail customers and third-party distributors.

31.     Defendant Ryan Brant was Take-Two's founder and was employed as the Company's Chairman and CEO until February 2001.  Thereafter, he remained Take-Two's Chairman until March 2004, when he "resigned" during the SEC's investigation into revenue recognition practices at Take-Two.  Pursuant to the Consent Decree, entered into in June 2005, Brant agreed to pay penalties and profits from illegally-earned bonuses of more than $3.6 million, and further agreed to be barred from serving as an officer or director of a public company for five years.

34560v1                                7

(a)      From March 2004 until October 16, 2006, Brant held the position of Vice President of Publishing and remained active in the management of the Company.  Indeed, although Brant resigned as Chairman and CEO less than half-way through fiscal 2004, he remained by far the Company's highest-earning executive for the full year, and the discretionary bonus he received, $1.6 million, was more than three times the next-largest bonus received by any other executive.  Brant's compensation for later years has not been disclosed by the Company.

(b)      As described below:  (i) Brant, along with other members of the Company's senior management, supervised the policy of improperly backdating stock options. Indeed, Brant was the primary beneficiary of this scheme, receiving at least 729,560 options that were dated at the lowest stock price for the month during which the options were granted to him.

(c)      On February 14, 2007, Brant pled guilty to a felony offense in connection with options backdating and also settled civil charges brought by the SEC.  In connection with his guilty plea, Brant acknowledged that he had caused Take-Two's Form 10-K for fiscal year 2002 to contain false financial statements as a result of options backdating.

32.      This Court held in the Decision (*see id.* at 129) that Defendant Brant was a control person under Section 20(a).

33.      Defendant Flug was a director of the Company from February 1998 to March 29, 2007 and was interim non-executive Chairman of the Company's board of directors from February 1, 2006 to March 29, 2007.  Flug was a member of the compensation committee of Take-Two's board of directors (the "Compensation Committee") from 2000 until December 2006 and its Chairman between 2004 and December 2006, during which time the Company has admitted that he and the other members of such committee "abdicated their responsibility, with

respect to the granting of stock options." (Take-Two Form 10-K for fiscal year ended October 31, 2006 ("2006 Form 10-K"), at 2.) As admitted by the Company and Flug under the terms of an agreement entered into by them dated February 23, 2007, Flug profited from exercising illegally backdated options in the amount of $83,504, and an additional 19,500 options then held by him were also illegally backdated and were re-priced.

34.    Defendant Oliver Grace was a director of the Company from April 1997 to March 29, 2007. Grace was a member of Take-Two's Compensation Committee from 2000 until December 2006, during which time the Company has admitted that he and the other members of such committee "abdicated their responsibility, with respect to the granting of stock options." (2006 Form 10-K, at 2.) As admitted by the Company and Grace under the terms of an agreement entered into by them dated February 23, 2007, Grace profited from exercising illegally backdated options in the amount of $59,532, and an additional 45,712 options then held by him were also illegally backdated and were re-priced.

35.    Defendant Todd Emmel was a director of the Company from February 2002 to March 29, 2007. Emmel was a member of Take-Two's Compensation Committee between 2002 and 2003, during which time the Company has admitted that he and the other members of such committee "abdicated their responsibility, with respect to the granting of stock options." 2006 Form 10-K, at 2. As admitted by the Company and Emmel under the terms of an agreement entered into by them dated February 23, 2007, Emmel profited from exercising illegally backdated options in the amount of $244,100, and an additional 35,079 options then held by him were also illegally backdated and were re-priced.

36.    The defendants identified in paragraphs 30 to 35 are referred to herein collectively as the "Defendants."

37.     The defendants identified in paragraphs 31 to 35 are referred to herein as the "Individual Defendants."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Take-Two's History of Accounting and Reporting Improprieties

#### 1.     The Company's First Restatement of Financial Results

38.     Since its inception as a public company in 1997, Take-Two has engaged in improper financial reporting and has been the subject of SEC investigations and related litigation. Take-Two first reported problems with its accounting in November 2001, prior to the commencement of the Individual Action Period, after the SEC initiated an informal investigation into the Company's revenue recognition practices. Take-Two conducted an internal investigation into the accounting matters at issue, and its investigation ultimately led to the First Restatement, in February 2002.

39.     The First Restatement acknowledged the Company's improper accounting for: (i) products that had not been shipped during the reported time period (the product "parking" transactions); (ii) product returns; and (iii) acquisitions of various companies. The Company was forced to restate its financial results to eliminate improperly recognized net sales of $15 million for fiscal year 2000, and $10.5 million for the first three quarters of 2001. The First Restatement also included a $19.2 million charge to correct improper accounting by a subsidiary.

40.     The fraudulent revenue recognition also resulted in private securities litigation in the Southern District of New York, captioned *In re Take-Two Interactive Software, Inc. Securities Litigation*, No. 01 Civ. 9919 (DLC) (S.D.N.Y. filed Dec. 18, 2001), which was ultimately settled.

### 2.    The Company's Second Restatement of Financial Results

41.    On December 18, 2003, Take-Two issued a press release disclosing that the SEC had issued Wells Notices to Take-Two, and certain Company officers, including defendant Brant, the Company's then-Chairman and CEO, stating that the SEC intended to bring a civil action seeking an injunction and damages against the Company.

42.    On January 30, 2004, Take-Two filed with the SEC a Form NT 10-K/12b-25 announcing, among other things, that the Company intended to amend its revenue recognition policies by adopting a new methodology for recording reserves for price concessions.  The Company also announced that the revision in the Company's revenue recognition policies would result in the Second Restatement of its previously issued financial results.

43.    In February 2004, Take-Two restated its financial results from November 1998 through 2003, to correct its accounting for continued fraudulent "parking" transactions and the failure to set aside adequate reserves for future price concessions granted to customers.  These fraudulent accounting practices materially overstated Take-Two's reported revenue and earnings for nine of the fifteen quarters between 2000 and 2003.

### 3.    The SEC Files Its Complaint and the Company, Brant and Other Officers Enter into Consent Decrees

44.    In June 2005, the SEC filed and simultaneously settled a civil action against Take-Two, Brant and certain other officers, alleging the Company's financial statements from 2000 through 2003 were false and misleading because, *inter alia*, the Company systematically engaged in fraudulent "parking" transactions, improperly recognized sales revenues for games that were still being manufactured, improperly accounted for the acquisition of two video games publishers, and failed to establish proper reserves for reduction in the prices of its games.

45.     At the same time, the Company agreed to the entry of the Consent Decree, which required that the Company pay a fine of $7.5 million and agree to commit no further violations of, *inter alia*, Section 10(b).

46.     Under a separate consent decree, Brant agreed to disgorge more than $3.1 million in bonuses that were improperly awarded for meeting financial targets achieved through the fraud, agreed to pay a $500,000 penalty, and agreed to be barred from serving as a director or officer of any public company for five years.  Three other executives also agreed to repay illegally-obtained bonuses and pay penalties in the amounts of $1.7 million, $1.0 million and $110,000, respectively.

**B.     Defendants Made Materially Misleading
         Statements About the Company's Financials**

     **1.     Background Concerning Employee Stock Options**

47.     Many publicly traded companies grant their officers and directors stock options as a form of incentive compensation.  Properly structured, such options serve to align the interests of management with the interests of the company's shareholders by providing incentives to perform well, thereby increasing the price of the company's shares.

48.     A stock option grant provides the recipient (the "optionee") with the right to purchase shares (the "underlying shares") of a company at a specific price – known as the "exercise price" or "strike price" – on or after a specified date.  If the exercise price is reduced, the value of the option to the optionee increases, at the expense of the company and its shareholders.

49.     Option grants typically provide that the options become exercisable ("vested") incrementally over a period of years.  In the case of Take-Two, options granted by the Company

have typically vested over five years, with 1/5 of the total options granted vesting on each anniversary of the grant date.

50.     The value of an option depends on the relationship between the option's exercise price and the market price of the underlying shares.  If the current market price of the underlying shares is above the option's exercise price, the option is described as "in the money." Conversely, if the current market price of the shares is below the option's exercise price, the option is described as "out of the money."  If the current market price of the underlying shares is the same as the option's exercise price, the option is described as "at the money."  For tax and accounting reasons, options are generally granted "at the money," as discussed below.

### 2.     **Take-Two's Stock Option Plans**

51.     Take-Two's 1997 Stock Option Plan (the "1997 Plan"), filed with the SEC on February 10, 1997 as Exhibit 10.6 to Form SB-2, provided in Individual Action part (§ F.1., at 276) that:

> The Exercise Price at which each share of Common Stock may be purchased pursuant to an Option shall be determined by the Committee [consisting of two members of the board of directors] . . . .

52.     The 1997 Plan further provided that, with exceptions not Individual Action here:

> the Exercise Price at which each share of Common Stock may be purchased pursuant to an [Option] shall be not less than 100% of the fair market value for each such share on the Date of Grant . . . .

53.     Similarly, the 2002 Stock Option Plan adopted by the Company (the "2002 Plan"), filed with the SEC on May 10, 2002 as Exhibit B to Form DEF 14A, provided in Individual Action part (§ 5, at 2) that:

> The purchase price of the Common Stock covered by each option shall be determined by the Board of Directors or the Committee [consisting of at least two members of the Board of Directors], as the case may be, and shall not be less than 100% of the Fair Market Value (as defined in

Paragraph 15 hereof) of a share of the Common Stock on the date on
which the option is granted.

54.     Take-Two's annual reports filed on Form 10-K with the SEC throughout the

Individual Action Period incorporated the 1997 and 2002 Plans by reference.

55.     Take-Two's annual reports filed with the SEC throughout the Individual Action

Period also repeatedly stated that the Company's financial statements accounted for its stock

option grants in accordance with Accounting Principles Board Opinion No. 25.  For example, the

Company's Form 10-K filed with the SEC for the fiscal year ended October 31, 2005 stated in

Individual Action part:

> The Company accounts for its employee stock option plans in
> accordance with Accounting Principles Board Opinion No. 25,
> "Accounting for Stock Issued to Employees" ("APB 25").  Under APB
> 25, generally no compensation expense is recorded when the terms of
> the award are fixed and the exercise price of the employee stock option
> equals or exceeds the fair value of the underlying stock on the date of
> grant.

56.     Take-Two's proxy statements issued during the Individual Action Period also

described the 1997 and 2002 Plans, and utilized these statements to induce the Company's

shareholders to approve the 2002 Plan and amendments to both the 1997 and 2002 Plans.  For

example, the Company's 2005 proxy statement, which was filed with the SEC on Form DEF

14A on May 16, 2005, provided (at 18):

> The 2002 Stock Option Plan will be administered by the Board or a
> Committee appointed by the Board.  The Board or Committee will
> determine . . . the exercise price, provided that the exercise price of all
> Incentive Stock Options . . . and non-qualified stock options granted
> must be at least equal to 100% of the fair market value of the Common
> Stock on the date of grant . . . .

57.     As the Court held in the Decision (*see below* at ¶¶ 131, 139), the foregoing

statements were materially false and misleading.

### 3.   Take-Two's Improper Pricing of Stock Option Grants

58.     As noted above, option grants to officers and directors are recognized as an advantageous form of executive compensation because they align the interests of management with the company's shareholders.  In the case of Take-Two, however, the use of options was corrupted through secret manipulation to provide windfall income to the optionees that was unearned, never disclosed to investors or the market, and provided no performance incentive.

59.     Between 1997 and 2005, Take-Two issued options to purchase more than 6,000,000 shares of the Company to senior managers and directors.  The granting of many of those options – particularly to key insiders such as defendants Brant, Flug, Grace and Emmel – constituted a fraud on Plaintiff.

60.     Specifically, the dates of stock option grants to insiders at Take-Two were routinely manipulated to fall on days with the lowest stock prices, thereby inflating the value of the option grants.

61.     The Company's manipulation of stock option grants in this manner was inconsistent with the public statements of Take-Two in numerous SEC filings that the exercise price of the option would equal the fair market value of the stock at the time of the grant. Moreover, the Company's treatment of stock options violated applicable Generally Accepted Accounting Principles ("GAAP").

62.     Lead Plaintiffs' expert in the class action – Professor Erik Lie, a Professor of Finance at the University of Iowa and a leading authority on options backdating – calculated that the mathematical probability of Take-Two's option grants described below occurring without manipulation was less than one in 76,000,000.

63.     Lead Plaintiffs' expert reached this conclusion by analyzing the grants made by Take-Two during the period 1997-2005 as follows.  First, option grant dates were determined

from public filings and matched with historical prices for Take-Two's stock. Each option grant

date was then ranked within the month and fiscal quarter in which it fell, with rank 1 indicating

the date with the lowest share price in the period, rank 2 indicating the date with the second-

lowest share price in the period and so on. By this method, Lead Plaintiffs' expert determined

rankings for each option grant date set forth in Table 1 (dates with rank 1 or 2 are highlighted).

**Table 1. Option Ranking Within Month and Fiscal Quarter**

| Grant Date | Rank in Month | Rank in Quarter |
|---|---|---|
| April 17, 1997 | 2 | 2 |
| December 29, 1997 | 1 | 1 |
| August 31, 1998 | 2 | 4 |
| September 1, 1998 | 2 | 3 |
| December 7, 1998 | 3 | 7 |
| May 14, 1999 | 2 | 23 |
| May 25, 1999 | 13 | 46 |
| June 7, 1999 | 22 | 46 |
| July 30, 1999 | 7 | 34 |
| August 24, 1999 | 21 | 33 |
| October 18, 1999 | 1 | 10 |
| November 16, 1999 | 12 | 14 |
| April 10, 2000 | 14 | 14 |
| April 14, 2000 | 1 | 1 |
| May 31, 2000 | 1 | 1 |
| July 21, 2000 | 6 | 9 |
| August 1, 2000 | 4 | 4 |
| October 30, 2000 | 10 | 28 |
| November 17, 2000 | 9 | 30 |
| November 28, 2000 | 1 | 1 |
| December 20, 2000 | 2 | 6 |
| February 16, 2001 | 7 | 16 |
| February 20, 2001 | 1 | 6 |
| May 1, 2001 | 17 | 55 |
| May 3, 2001 | 5 | 5 |
| October 1, 2001 | 1 | 2 |
| February 15, 2002 | 8 | 8 |
| February 22, 2002 | 1 | 1 |
| June 21, 2002 | 1 | 1 |
| August 6, 2002 | 1 | 1 |
| November 13, 2002 | 1 | 36 |
| November 18, 2002 | 9 | 46 |

**Table 1.  Option Ranking Within Month and Fiscal Quarter**

| Grant Date | Rank in Month | Rank in Quarter |
|---|---|---|
| May 1, 2003 | 1 | 1 |
| September 30, 2003 | 4 | 25 |
| April 14, 2004 | 12 | 28 |
| July 27, 2004 | 21 | 62 |
| Total # Days | 36 | 36 |
| # Rank 1 (of 36) | 12 | 8 |
| # Rank 1 or 2 (of 36) | 17 | 10 |

64.    Next, the probability of the number of grant dates of rank 1 and rank 2 was calculated using a binomial distribution probability function, where the number of occurrences was the number of grant dates of rank 1 (or ranks 1 and 2), the number of observations was the total number of grant dates, and the probability was calculated by assuming twenty trading days per month (resulting in a 5% probability for each day) and sixty trading days per quarter (resulting in a 1.67% probability for each day).

65.    The probability of less than one in 76,000,000, as noted above, is the probability of 17 of 36 dates being ranked 1 or 2 in their respective calendar months.

66.    The extraordinarily improbable distribution of option grants is further illustrated by Table 2, which indicates the individual beneficiaries of the grant date manipulation including defendant Brant.  (Publicly available data was not available for all defendants.)

**Table 2.  Rank of Option Grants Within Month of Grant, by Optionee**

| Optionee | Rank in Month (rank 1 indicates the date with the lowest share price in the month) | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5-6 | 7-8 | 9-10 | 11-12 | 13-14 | 15-16 | 17-19 | 20-22 | |
| Brant, Ryan | 792,560 | 50,000 | 100,000 | 250,000 | | 100,000 | | | | | 200,000 | | 1,429,560 |
| David, James Jr. | 115,000 | | | | | | | | | | 200,00 | | 135,000 |
| Eibeler, Paul | 140,000 | | | | 375,000 | 15,000 | 15,000 | 450,000 | | | | | 995,000 |
| Judd, Samuel | | | | | | | | | | | | 135,000 | 135,000 |
| Lapin, Jeffrey | | | | | | | 400,000 | | | | | | 400,000 |
| Leeds, Don | | | | | 400,000 | | | | | | | | 400,000 |
| Lewis, Gary | | | | | | | 217,500 | | | | | | 217,500 |
| Muller, Larry | 350,000 | 20,000 | 10,000 | 25,000 | | | 25,000 | 20,000 | 135,000 | | | 20,000 | 605,000 |
| Ptak, Thomas | | 15,000 | | | | | | | | | | | 15,000 |
| Ras, Barbara | 15,000 | 55,000 | 5,000 | | | | | | | | | | 75,000 |
| Roedel, Richard | | | | | | | 72,000 | | | | | | 72,000 |

**Table 2.  Rank of Option Grants Within Month of Grant, by Optionee**

| Optionee | Rank in Month (rank 1 indicates the date with the lowest share price in the month) | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5-6 | 7-8 | 9-10 | 11-12 | 13-14 | 15-16 | 17-19 | 20-22 | |
| Rutcofsky, Barry | | | | 50,000 | | | | | | | | | 50,000 |
| Seremet, Mark | 50,000 | | | | | | | | | | | | 50,000 |
| Sumner, Kelly | 370,000 | 385,000 | | 25,000 | | | 25,000 | | 130,000 | | 100,000 | 75,000 | 1,110,000 |
| Williams, Anthony | 150,000 | | | | | | | | | | | | 150,000 |
| Winters, Karl | | | | | | 200,000 | | | | | | | 200,00 |
| Total | 1,719,560 | 725,000 | 115,000 | 300,000 | 425,000 | 715,000 | 465,000 | 759,500 | 265,000 | 0 | 320,000 | 230,000 | 6,039,060 |

67.     While the statistical analysis discussed above definitively demonstrates the intentional nature of Take-Two's misconduct, the willful and knowing nature of these acts is further evidenced by their continuation after the implementation of the Sarbanes-Oxley Act of 2002 (effective August 29, 2002) ("SOX") which required reporting of stock option grants on Form 4 within two business days of the grant award.

68.     Of the nine option grants by the Company following SOX, three were rank 1 grants under the methodology described above, *i.e.*, were made on the date in their respective calendar months with the lowest share price, and each of these was reported more than two business days after the grant award, in violation of SOX.

69.     Defendants Brant, Flug, Grace, and Emmel, as well as other top officers, directors, and employees of Take-Two, subsequently exercised their options, and thereby derived substantial monetary benefits from the abnormally low exercise prices previously obtained through manipulation of their stated grant dates.  These and other Company directors and officers' option exercises are set forth in Tables 3 and 4.

**Table 3.  Exercise of Options (November 1998 to August 2003)**

| INSIDER | Nov-98 | Jan-99 | May-01 | Apr-02 | Sep-02 | Mar-03 | Jun-03 | Jul-03 | Aug-03 |
|---|---|---|---|---|---|---|---|---|---|
| Brant, Ryan | 100,000 | | | | 37,667 | | 100,000 | | 45,027 |
| Eibeler, Paul | | | | | | 5,000 | | | |
| Emmel, Todd | | | | | | | | | |
| Flug, Robert | | | | | | | | 13,568 | |
| Grace, Oliver, Jr. | | | | 33,746 | | | | | |
| Lewis, Gary | | | | | | | | | |
| Lewis, Mark | | | | | | | 60,000 | | |
| Ras, Barbara | | 40,243 | | | | | | | |

34560v1                                          18

**Table 3.  Exercise of Options (November 1998 to August 2003)**

| INSIDER | Nov-98 | Jan-99 | May-01 | Apr-02 | Sep-02 | Mar-03 | Jun-03 | Jul-03 | Aug-03 |
|---|---|---|---|---|---|---|---|---|---|
| Sumner, Kelly | | | 25,000 | | | | | | |
| Tisch, Steven | | | | | | | | | |
| Winters, Karl | | | | | | | | | |
| **TOTAL** | **100,000** | **40,243** | **25,000** | **33,746** | **37,667** | **5,000** | **160,000** | **13,568** | **45,027** |

**Table 4.  Exercise of Options (September 2003 to September 2005 and Cumulative Totals)**

| INSIDER | Sep-03 | Oct-03 | Nov-03 | Oct-04 | Mar-05 | Jun-05 | Jul-05 | Sep-05 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| Brant, Ryan | 20,000 | 5,000 | 125,000 | | | | | | 432,694 |
| Eibeler, Paul | | | | | | | | | 5,000 |
| Emmel, Todd | 15,150 | | | | 7,070 | | | | 22,220 |
| Flug, Robert | | | | | | 12,324 | 6,000 | 6,324 | 38,216 |
| Grace, Oliver, Jr. | | | | | | | | | 33,746 |
| Lewis, Gary | | | | | | 10,000 | 20,000 | | 30,000 |
| Lewis, Mark | | | | | | | | | 60,000 |
| Ras, Barbara | | | | | | | | | 40,243 |
| Sumner, Kelly | | | | | | | | | 25,000 |
| Tisch, Steven | | | | | | 25,000 | | | 25,000 |
| Winters, Karl | 10,000 | | | 5,000 | 112,000 | 50,000 | | 7,500 | 184,500 |
| **TOTAL** | **45,150** | **5,000** | **125,000** | **5,000** | **119,070** | **97,324** | **26,000** | **13,824** | **896,619** |

### 4.   The Company Later Confirmed that Defendant Brant and Other Senior Managers Had Backdated Options or Recklessly Allowed Backdating to Occur

70.   On June 26, 2006, Take-Two announced that it had received a grand jury subpoena from the Manhattan D.A.'s Office concerning, *inter alia*, the compensation of former officers and directors.

71.   On July 10, 2006, the last day of the Individual Action Period, the Company announced that it was the subject of an SEC investigation into possible options backdating, and that it had convened the Special Committee to investigate options backdating at the Company.

72.   On December 11, 2006, Take-Two announced that the Special Committee had reported its preliminary findings to the Company's board of directors.  The Special Committee "found that there were improprieties in the process of granting and documenting stock options" and that as a result, "the Company [would] need to restate historical financial statements to record non-cash charges for compensation expense relating to past stock option grants."  As a

result, Take-Two cautioned that "all consolidated financial statements, earnings releases and similar communications issued by the Company" during its entire life as a public company – extending back a full decade, to 1997 – "should no longer be relied upon."

73.     On January 17, 2007, the Company announced that because of the need to restate its financial statements to account for options backdating, it would be unable to file its Form 10-K for fiscal year 2006 on time.

74.     On January 22, 2007, Take-Two announced the completion of the Special Committee's report.  The report's findings included the following:

> •     The Company, in granting options, failed in many cases to comply with the terms of its Stock Option Plans, did not maintain adequate control and compliance procedures for option grants, and did not generate or maintain adequate or appropriate documentation of such grants.  In addition, the Compensation Committee abdicated its option granting responsibilities and permitted the Company's prior Chief Executive Officer, Ryan Brant, to control and dominate the granting process.

> •     Between April 1997 and August 2003, Mr. Brant engaged in a pattern and practice of backdating options, and during such period, a significant number of option grants appear to have been backdated.

75.     On February 14, 2007, the Manhattan D.A.'s Office announced that Brant had pled guilty on charges of falsifying Take-Two's records to backdate stock option grants.  As stated in the Manhattan D.A.'s press release:

> BRANT ignored the dictates of the shareholder approved option plans and backdated Take-Two stock option grants to coincide with the dates of the low or near-low Take-Two stock price for a particular period or quarter.  In some situations, this involved backdating the option grant dates; in other situations, it involved delaying the option grant dates.  This misconduct, used to benefit not only BRANT, but also other senior executives and Take-Two employees, meant that Take-Two personnel received millions of dollars in unrecorded compensation.

34560v1                                   20

76.     According to a supporting statement filed by an investigator with the Manhattan

D.A.'s Office:

> Deponent states he is informed by defendant [Brant] that:  (1) from
> 1993 to February 2001 defendant was TTWO's Chief Executive
> Officer, and from 1993 to March 2004, he was TTWO's Chair of the
> Board of Directors ("BOD"); (2) during this period, TTWO issued
> stock options to provide substantial compensation to its directors,
> officers, and employees; (3) under defendant's auspices the records of
> TTWO, in connection with substantial stock options, were falsified to
> reflect artificial grant dates rather than the grant dates required under
> TTWO's programs and by professional accounting principles; (4) by
> 2002 defendant knew of the accounting consequences and failed to
> correct TTWO's records and consciously continued to direct,
> personally and through designees, the issuance of substantial numbers
> of options utilizing false artificial grant dates; and (5) under
> defendant's auspices TTWO created false fiscal year 2002 financial
> statements for its fiscal year ending October 31, 2002, and, in
> December 2002, falsely promulgated such false statements, in whole
> and in part, in filings with the Securities and Exchange Commission
> and to the public in press releases.

77.     Under the terms of his plea agreement, Brant agreed to pay a $1 million penalty to

New York State and New York City.

78.     Also on February 14, 2007, the SEC announced that it had simultaneously filed

and settled civil charges against Brant, alleging that during a seven year period, Brant enriched

himself and others by granting undisclosed, "in the money" stock options to himself and to other

Take-Two officers and employees.

79.     Under the terms of the consent order then entered by the SEC and Brant (the

"Backdating Consent Decree"), Brant was permanently barred from serving as an officer or

director of a public company and paid more than $4.1 million in disgorgement, $1.1 million in

prejudgment interest, and agreed to a $1 million civil penalty.

80.     The SEC's complaint alleged that from 1997 to 2003, Brant selected grant dates

for the company's incentive stock options that coincided with dates of historically low closing

prices for Take-Two's common stock, resulting in grants of "in the money" options, a practice that Brant and others at Take-Two referred to as "pick-a-date" option granting.

81.     The SEC's complaint further alleged that Brant acted with the participation and knowledge of senior executives and others at Take-Two, and that at Brant's direction, Take-Two officers and employees prepared documents falsely indicating that the option grants had been made on earlier dates when Take-Two's stock price had closed lower.  The complaint alleged that from 1997 to September 2003, Brant awarded himself ten backdated option grants, representing a total of approximately 2.1 million shares of Take-Two common stock.

82.     On February 23, 2007, Take-Two announced in a Form 8-K filing that "certain stock options issued by the Company to" defendants Flug, Grace and Emmel, as well as two other directors of Company were "improperly dated" and that each of the directors had entered into an agreement to repay the compensation that they had unlawfully obtained.

83.     Notably, the "repayment" was effected by cancellation of unexercised options held by the directors, relieving the directors of the burden of making any out-of-pocket payment.

84.     Take-Two's agreement with its directors also provided that the remaining backdated options held by them, rather than being cancelled, would simply be repriced.

85.     The size of the repayments by defendants Flug, Grace, Emmel and the other directors pursuant to their February 23, 2007 agreement with the Company, and the additional value of the unexercised options then held by them that were re-priced, are set forth in Table 5.

**Table 5.  Repayments and Additional Amounts Forfeited by Directors Through Repricing of Illegally Backdated Options**

| Director | Repayment | Amount Forfeited Through Repricing | TOTAL |
|---|---|---|---|
| Todd Emmel | $59,532 | $111,962 | $171,494 |
| Robert Flug | 244,100 | 61,620 | 305,720 |
| Oliver R. Grace, Jr. | 83,504 | 166,433 | 249,937 |
| Mark Lewis | 141,260 | 25,536 | 166,796 |
| Steven Tisch | 10,620 | -- | 10,620 |

**Table 5. Repayments and Additional Amounts Forfeited by Directors Through Repricing of Illegally Backdated Options**

| Director | Repayment | Amount Forfeited Through Repricing | TOTAL |
|---|---|---|---|
| **TOTAL** | **$539,016** | **$365,552** | **$904,568** |

86.     Finally, on February 28, 2007, Take-Two issued its delayed Form 10-K for fiscal year 2006.  The 2006 Form 10-K confirmed that the Company had routinely backdated stock options, and reported (at 1) that the Special Committee's investigative team:

> found that the Company, in granting options, failed in many cases to comply with the terms of its Stock Option Plans, did not maintain adequate control and compliance procedures for option grants, and did not generate or maintain adequate or appropriate documentation of such grants.

87.     According to the 2006 Form 10-K (at 1), the Special Committee further concluded that defendant Brant (identified by job title):

> controlled and dominated the stock option granting process.  More specifically, during that period, numerous option grants appear to have been backdated through a variety of methods.  It was determined that the [Brant] was primarily responsible for the selection of exercise prices and grant dates and the resulting backdating issues and was assisted by certain past employees and past members of management.

88.     The 2006 Form 10-K (at 2, 88) also characterized the members of the Compensation Committee, which included defendants Flug, Grace and Emmel, as having "*abdicated their responsibility*" in allowing stock options backdating to occur.

89.     The 2006 Form 10-K also reported the financial effects of Defendants' backdating scheme.  As discussed below, the impact on reported earnings was highly material, resulting in an overstatement of 20% in fiscal year 2002, 11% in fiscal year 2003, and 5-6% in fiscal years 2004 and 2005.

90.     Also on February 28, 2007, the Company filed a proxy statement for its annual meeting, to be held in March 2007, and presented a slate of six directors, three of whom,

including defendants Flug and Grace, were among the directors who had acknowledged receiving improperly backdated options five days earlier.

91.     On March 29, 2007, the shareholders of Take-Two elected an alternate slate of directors presented by a group of institutional shareholders.

92.     Thereafter, on April 5, 2007, Take-Two announced that the SEC had upgraded its investigation into options backdating at the Company to formal status.

93.     Finally, in late May 2007, Take-Two's former general counsel, Kenneth Selterman and comptroller, Patti Tay, each pled guilty to Falsifying Business Records in the Second Degree in New York State Supreme Court.

### 5.     The Backdating Scheme Rendered Take-Two's Financial Statements Materially False and Misleading

94.     Take-Two's options backdating scheme caused the Company to violate GAAP and rendered its financial statements materially misleading.

95.     GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  They are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association.

96.     SEC Rule 4-01(a) of SEC Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided."  17 C.F.R. § 210.4-01(a)(1).  Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. § 210.10-01(a).

97.     At all times Individual Action to this Complaint, the accounting treatment for stock options issued to officers and directors was governed by Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees."[1]

98.     Where options are issued at an exercise price equal to the market price of the underlying shares (*i.e.*, "at the money"), no compensation expense is recorded under APB 25.

99.     By contrast, APB 25 requires a company to record a compensation cost when an option is granted with an exercise price below the market price of the underlying shares on the date of grant (i.e., "in the money"). The compensation cost is equal to the total number of options granted multiplied by the difference between the exercise price and market price of the stock on the date of grant. This cost is recorded (amortized) in installments over the option's vesting period.

100.    Thus, a failure to properly account for "in the money" option grants in accordance with APB 25 will result in misstatements in a corporation's financial statements. A company that fails to record and amortize the value of "in the money" option grants understates compensation and overstates net income on its income statement in each fiscal quarter and year during the vesting period of an option.

101.    As admitted in the Third Restatement, the effect of options backdating was to overstate net income as set forth in Table 6.

**Table 6. Overstatement of Net Income, as Originally Reported vs. as Restated (amounts in thousands)**

| Year Ended | As Originally Reported | As Restated | Overstatement ($) | Overstatement (%) |
|---|---|---|---|---|
| October 31, 2002 | $71,563 | $59,667 | $11,896 | 19.9% |

[1] SFAS 123, issued in 2002, established an alternative measure for valuing options, but gave corporations the choice of continuing to use APB 25, which Take-Two elected to do. A subsequent pronouncement, SFAS 123R, was issued in 2005 and required companies to adopt the alternative measure commencing in 2006. The change in valuation methodology preferred by SFAS 123 and required by SFAS 123R is not directly Individual Action to the wrongdoing alleged herein because the granting of backdated options, as alleged herein, occurred prior to the adoption of SFAS 123R.

**Table 6.  Overstatement of Net Income, as Originally Reported vs. as Restated (amounts in thousands)**

| Year Ended | As Originally Reported | As Restated | Overstatement ($) | Overstatement (%) |
|---|---|---|---|---|
| October 31, 2003 | 98,118 | 88,672 | 9,446 | 10.7% |
| October 31, 2004 | 65,378 | 62,119 | 3,259 | 5.2% |
| October 31, 2005 | 37,475 | 35,314 | 2,161 | 6.1% |

102.    Accordingly, Take-Two's improper accounting for options rendered the financial results set forth in all SEC annual and quarterly reports, and the press releases reporting such results, materially false and misleading.

103.    The materiality and impact of the Company's manipulation on its financial results was further magnified by the circumstances under which such results were reported.  First, investors viewed Take-Two as a growth company, and analyzed growth trends closely.  As a result, improper accounting that inflated year-over-year and quarter-over-quarter growth was material to investors, even if it did not have a large impact on the absolute value of the misreported items.

104.    Second, the market was highly sensitive to the Company's ability to meet analysts' expectations, and any variance in revenue or earnings could have a major impact on share price if such variance caused the Company's results to fall below analysts' targets.

105.    Third, misstatements that benefit senior management by increasing its compensation are regarded as more material because they can undermine a company's credibility in the market and present a conflict of interest.

106.    Generally Accepted Auditing Standards ("GAAS"), which govern audits of public companies,[2] provide specific guidance on the evaluation of materiality in financial statements,

---

[2] In 2004, the Public Company Accounting Oversight Board ("PCAOB"), created under the Sarbanes-Oxley Act of 2002, assumed responsibility for oversight of auditors of public companies, and adopted previously issued GAAS

and on the evaluation of factors such as those noted above, which it refers to as "qualitative"

materiality.  The Individual Action section of GAAS, AU § 9312.17, specifically calls for

auditors to consider, among other things:

> *f.*    A misstatement that has the effect of increasing management's
> compensation, for example, by satisfying the requirements for
> the award of bonuses or other forms of incentive compensation.
>
> *    *    *
>
> *j.*    The significance of the misstatement or disclosures relative to
> known user needs, for example—
>
> •    The significance of earnings and earnings per share to
> public-company investors and the significance of equity
> amounts to private-company creditors.
>
> *    *    *
>
> •    The effect of misstatements of earnings when
> contrasted with expectations.

107.    In sum, Take-Two's improper backdating of employee stock options and its

improper accounting for such options during the Individual Action Period violated GAAP and

rendered the financial results it reported during the Individual Action Period materially

misleading.  Take-Two's options backdating also rendered the statements in the Form 10-K's

and proxy statements filed during the Individual Action Period concerning its option granting

practices false and misleading.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

108.    Throughout the Individual Action Period, the Company and various of the

Individual Defendants filed annual reports on Form 10-K and quarterly reports on Form 10-Q

with the SEC, and disseminated numerous earnings releases that contained materially false and

---

pronouncements as interim standards of the PCAOB. References to "AU" sections and paragraphs (*e.g.*, AU
§ 150.02) herein are to the codification of GAAS.

misleading statements regarding the Company's earnings and accounting for employee stock options.

### A.   <u>Fiscal Year 2004</u>

**First Fiscal Quarter 2004**

109.   On March 4, 2004, before the market opened, the Company issued a press release announcing its financial results for the first quarter, ended January 31, 2004.  The press release stated in part:

> Net income for the quarter was $31.8 million, compared to $51.5 million last year, with diluted net income per share of $0.70 compared to $1.22 last year.

110.   After the Company issued this release, Take-Two common stock rose from an opening price of $31.97 per share on March 4, 2004 to a close that day of $33.47.  *See* Ex. D.

111.   Take-Two's financial results for the quarter ended January 31, 2004 were repeated in the Company's quarterly report on Form 10-Q ("1Q 2004 10-Q"), filed with the SEC on March 16, 2004.

112.   With respect to accounting for employee stock options, the 1Q 2004 10-Q stated (at 8):

> The Company accounts for its employee stock option plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").

113.   The Company's 1Q 2004 10-Q further stated (at 7):

> In the opinion of management, the financial statements reflect all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of the Company's financial position, results of operations and cash flows.

114.   After the filing of this 10-Q, Take-Two common stock rose from a March 16, 2004 opening of $33.75 to a close that day of $34.14 per share.  *See* Ex. D.

**Second Fiscal Quarter 2004**

115.    On June 8, 2004, before the market opened, the Company issued a press release announcing its financial results for the second quarter, ended April 30, 2004.  The press release stated in part:

> Net loss for the quarter was $14.6 million, compared to net income of $14.6 million last year, with a net loss of $(0.33) per share compared to diluted net income per share of $0.35 last year.

116.    After this release, Take-Two common stock rose from an opening price on June 8, 2004 of $27.42 per share to close that day at $28.65 per share on massive volume.

117.    Take-Two's financial results for the quarter ended April 30, 2004 were repeated in the Company's quarterly report on Form 10-Q ("2Q 2004 10-Q"), filed with the SEC on June 14, 2004.

118.    With respect to accounting for employee stock options, the 2Q 2004 10-Q stated (at 8):

> The Company accounts for its employee stock option plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").

119.    The Company's 2Q 2004 10-Q further stated (at 7):

> In the opinion of management, the financial statements reflect all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of the Company's financial position, results of operations and cash flows.

120.    After this 10-Q was filed, Take-Two common stock rose from a June 14, 2004 opening price of $29 per share to close that day at $29.45 per share.

**Third Fiscal Quarter 2004**

121.     On September 9, 2004, after the market closed, the Company issued a press release announcing its financial results for the third quarter, ended July 31, 2004.  The press release stated in part:

> Net loss for the quarter was $14.4 million, compared to net income of $5.7 million last year, with a net loss of $0.32 per share compared to net income per share of $0.13 last year.

122.     After this release was issued, Take-Two common stock rose from a close on September 9, 2004 of $32 per share to a close of $33.67 per share on September 10, 2004.  *See* Ex. D.

123.     Take-Two's financial results for the quarter ended July 31, 2004 were repeated in the Company's quarterly report on Form 10-Q ("3Q 2004 10-Q"), filed with the SEC on September 14, 2004.

124.     With respect to accounting for employee stock options, the 3Q 2004 10-Q stated (at 8):

> The Company accounts for its employee stock option plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").

125.     The Company's 3Q 2004 10-Q further stated (at 7):

> In the opinion of management, the financial statements reflect all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of the Company's financial position, results of operations and cash flows.

126.     After this 10-Q was filed, Take-Two stock rose from a September 14, 2004 opening price of $34.16 per share to close that day at $34.39 per share.

**Fiscal Year-End 2004**

127.    On December 22, 2004, Defendants filed the Company's annual report on Form

10-K ("2004 Form 10-K") with the SEC.  The 2004 Form 10-K was signed by, among others,

defendants Flug, Grace and Emmel.

128.    With respect to its accounting for employee stock options, the 2004 Form 10-K

stated (at 49):

> The Company accounts for its employee stock option plans in
> accordance with Accounting Principles Board Opinion No. 25,
> "Accounting for Stock Issued to Employees" ("APB 25").

129.    Additionally, the 2004 Form 10-K expressly incorporated by reference (at 36) the

1997 and 2002 Plans, and thereby falsely represented compliance with the terms thereof

130.    After the 2004 Form 10-K was filed, Take-Two common stock rose from a

December 22, 2004 opening price of $32.85 per share to close that day at $32.89 per share.

131.    <u>False Statements Relating to Options Backdating</u>.  As this Court held in the

Decision (*see id.* at 94), the foregoing statements made or disseminated with respect to the

Company's 2004 fiscal year were false and misleading in light of Defendants' practice of

backdating employee stock options and either (i) were known by Defendants to be false and

misleading at that time, or (ii) Defendants were reckless in issuing such statements, for the

following reasons, among others:

(a)    the Company did not grant employee stock options at 100% of the fair

market value on the date of grant, in violation of the Company's shareholder-approved option

plans;

(b)    the Company did not account for employee stock options in compliance

with APB 25;

(c)      by reason of its improper accounting for employee stock options, the

Company materially understated compensation expenses and materially overstated net income in

violation of GAAP and SEC regulations; and

(d)      the information contained in the Company's annual and quarterly reports

did not fairly present, in all material respects, the financial condition and results of operations of

the Company.

**B.      Fiscal Year 2005**

**First Fiscal Quarter 2005**

132.      On March 3, 2005, Plaintiff made his first purchase of Take-Two common stock

in the amount of 1,000 shares.  *See* Ex. E.  Plaintiff bought the remainder of his Take-Two

shares, totaling 924,500 shares, by April 21, 2005.  *See id.*

133.      Also on March 3, 2005, after the market closed, the Company issued a press

release announcing its financial results for the first quarter ended January 31, 2005.  The press

release stated in part:

> Net income for the quarter rose to $55.2 million, a 74% increase from
> net income of $31.8 million during the same period last year.

134.      After this release, Take-Two common stock rose from a March 3, 2005 close of

$37.42 to a March 4, 2005 close of $39.53 on high volume.

135.      Take-Two's financial results for the quarter ended January 31, 2005 were

repeated in the Company's quarterly report on Form 10-Q ("1Q 2005 10-Q"), filed with the SEC

on March 10, 2005.

136.      With respect to accounting for employee stock options, the 1Q 2005 10-Q stated

(at 7):

The Company accounts for its employee stock option plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").

137.    The Company's 1Q 2005 10-Q further stated (at 6):

In the opinion of management, the financial statements reflect all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of the Company's financial position, results of operations and cash flows.

138.    After Defendants filed this 10-Q, Take-Two common stock rose from a March 10, 2005 close of $40.62 per share to close that day at $40.74 per share.

139.    <u>False Statements Relating to Options Backdating</u>.  As this Court held in the Decision (*see id.* at 94), the foregoing statements made or disseminated with respect to the Company's 2005 fiscal year were false and misleading in light of Defendants' practice of backdating employee stock options and either (i) were known by Defendants to be false and misleading at that time, or (ii) Defendants were reckless in issuing such statements, for the following reasons, among others:

(a)    the Company did not grant employee stock options at 100% of the fair market value on the date of grant, in violation of the Company's shareholder-approved option plans;

(b)    the Company did not account for employee stock options in compliance with APB 25;

(c)    by reason of its improper accounting for employee stock options, the Company materially understated compensation expenses and materially overstated net income in violation of GAAP and SEC regulations; and

(d)    the information contained in the Company's annual and quarterly reports did not fairly present, in all material respects, the financial condition and results of operations of the Company.

## THE TRUTH COMES OUT

140.    As this Court held in the Decision (*see id.* at 69), the truth about Take-Two's option backdating was finally revealed on July 10, 2006, when the Company announced that it had received notice from the SEC that it was conducting another investigation of the Company, this time into Take-Two's stock option grants from January 1997 to the present.  The press release also announced that the Company had initiated an internal investigation into prior stock option grants.  Immediately following these disclosures, the Company's stock dropped approximately 7.5% from the prior day's closing price of $10.10 per share to $9.34 per share, in effect, reducing the Company's market capitalization by over $55.1 million.

## VII.    SCIENTER

141.    As alleged herein, and as found by this Court in the Decision (*see id.* at 107, 125) the Defendants acted with scienter in that they knew, or acted with reckless disregard with respect to the fact that, the public documents and statements issued by or on behalf of Take-Two contained materially false and misleading statements and/or omitted material facts necessary to make such statements not false and misleading.

142.    Defendant Brant did not contest his scienter in the class action.  *See* Decision at 95.

**A.    Scienter Allegations with Respect to Options Backdating**

        **1.    Defendants Brant, Flug, Grace and Emmel Personally Enriched Themselves Through Options Backdating**

143.      As this Court found in the Decision (*see id.* at 95, 97), Defendants Brant, Flug, Grace and Emmel all had clear motives to intentionally engage in, or recklessly allow, options backdating to occur, because each of them personally benefited from options backdating.

144.      As stated in paragraph 77, Brant subsequently agreed to pay more than $4.1 million to disgorge his illegally-obtained profits from options backdating pursuant to the Backdating Consent Decree.

145.      As set forth in Table 5 (at page 23), defendants Emmel, Flug and Grace each repaid, and forfeited through the repricing of unexercised options, between $171,000 and $305,000 to disgorge or forego illegally-obtained profits from options backdating.

        **2.    Defendants Brant, Flug, Grace and Emmel Had the Opportunity to Commit the Fraud**

146.      As this Court found (*see* Decision at 107), Defendants Brant, Flug, Grace and Emmel had the opportunity to commit and participate in the options backdating fraud described above.  As noted above, these defendants were senior officers and/or directors of Take-Two, and thus controlled, authored and/or were responsible for the Company's press releases, corporate reports and SEC filings disseminated during the Individual Action Period. Thus, they controlled the public dissemination of, and could falsify or omit, the material information about Take-Two's financial results and operations that reached the public and affected the price of the Company's stock.

### 3. Take-Two and Brant Have Admitted that Options Were Intentionally Backdated by Brant When He Was CEO

147. As set forth in greater detail in paragraphs 15-16 and 31, Take-Two's Special Committee found, and Take-Two admitted in its 2006 Form 10-K, that the Company's then-CEO, defendant Brant, assisted by other former members of management, engaged in options backdating through a variety of methods while he was CEO.

148. Brant admitted in connection with his guilty plea on a felony count of falsifying business records that he falsified Take-Two's records in connection with stock options backdating, knew the accounting consequences thereof, and caused Take-Two to issue a false financial statements in its 2002 Form 10-K. *See* ¶17.

### 4. Take-Two Has Admitted that the Members of Its Compensation Committee Acted Recklessly with Respect to the Granting of Employee Stock Options

149. As set forth in further detail in paragraphs 16 and 31-35, Take-Two admitted in its 2006 Form 10-K that the members of the Compensation Committee "abdicated their responsibility" with respect to the granting of stock options. Take-Two also admitted, in a Form 8-K filing on January 22, 2007, that the Compensation Committee "abdicated its option granting responsibilities and permitted the Company's prior Chief Executive Officer, Ryan Brant, to control and dominate the granting process."

150. Defendants Flug, Grace and Emmel were members of the Compensation Committee during the period of time when the Company has admitted to backdating options, namely, between April 1997 and August 2003 (2006 Form 10-K, at 1).

151. Defendants Flug, Grace and Emmel each received backdated options and profited substantially therefrom, as admitted by them and the Company in a Form 8-K filing on February 23, 2007.

152.    The misfeasance and nonfeasance attributed by Take-Two to the Compensation Committee and its members, including defendants Flug, Grace and Emmel, reflects and constitutes, at the least, recklessness on their part.

**5.    Guilty Pleas by Brant and Other Former Senior Executives of Take-Two Provide Strong Circumstantial Evidence of Scienter as to Take-Two**

153.    Defendant Brant and two other former senior executives of Take-Two have pled guilty to felonies and misdemeanors relating to the backdating of stock options, providing further strong circumstantial evidence of Take-Two's scienter.

154.    On February 14, 2007, the Manhattan D.A.'s Office announced the conviction by guilty plea of Brant.  The press release issued by the Manhattan D.A.'s Office stated:

> Two's board of directors and, from 1993 to February 2001, as Take-Two's chief executive officer.  In 1997 and 2002, Take-Two adopted shareholder approved stock option plans, both requiring stock option grants to be made by a compensation committee composed of two Take-Two directors.  Both plans forbid employee incentive stock option grants with exercise prices less than the fair market value of Take-Two stock on the grant date.
>
> BRANT ignored the dictates of the shareholder approved option plans and backdated Take-Two stock option grants to coincide with the dates of the low or near-low Take-Two stock price for a particular period or quarter.  In some situations, this involved backdating the option grant dates; in other situations, it involved delaying the option grant dates.  This misconduct, used to benefit not only BRANT, but also other senior executives and Take-Two employees, meant that Take-Two personnel received millions of dollars in unrecorded compensation.  Determining the exact option grant dates is difficult, but it is clear that BRANT himself obtained several million dollars of improper and unrecorded compensation.
>
> *    *    *
>
> In a seven year period, from 1997 to 2003, BRANT received ten backdated option grants for a total of approximately 2.1 million shares of Take-Two stock, all of which he exercised before resigning from the company in October 2006.  For example, Take-Two's records reflect that, on February 22, 2002, fifteen people received grants of

34560v1                                    37

511,000 stock options, 100,000 of which went to BRANT. On February 22, 2002, Take-Two stock closed at $15.25 per share, the lowest price during the company's February to April 2002 fiscal quarter. In fact, however, the decision to award many of those options was not made until mid-April 2002, when the stock price was above $20 per share. Take-Two's business records, including purported Compensation Committee minutes, were falsified after the fact to reflect the earlier grant date.

Similarly, Take Two's records falsely reflect that on June 21, 2002, BRANT received a grant of 100,000 stock options, and two others received an additional 125,000 stock options, all with an exercise price of $16.83. In reality, those grants were made after June 21, 2002, at a time when the stock price was higher. The June 21 grant date was chosen because that was the date of the lowest Take-Two share price during the company's May to July fiscal quarter.

BRANT intentionally ignored the accounting consequences of issuing backdated stock option grants. BRANT and Take-Two falsely informed the investing public, in the company's financial statements, that generally accepted accounting principles were being followed when, in fact, they were not. If Take-Two had followed the proper accounting principles, Take-Two's financial statements would have had to report higher general and administrative operating expenses, including higher compensation to BRANT and other company personnel.

BRANT entered a plea of guilty in New York County Supreme Court to Falsifying Business Records in the First Degree, a Class "E" felony. In settlements with the District Attorney's Office and the United States Securities and Exchange Commission (the "SEC"), Brant will make a total payment of $7,261,606. Of this, $6,261,606 representing disgorgement of the benefits derived from back-dating the stock option grants, interest and a civil penalty, will be distributed to harmed investors pursuant to BRANT's agreement with the SEC. The remaining $1 million, less costs of prosecution, will be paid to the City and State of New York. In addition, BRANT has submitted to an immediate and permanent bar from holding any "control management positions" in publicly traded companies. The defendant is expected to be sentenced to a term of probation.

155.    In addition to Brant, Take-Two's former comptroller and Chief Accounting

Officer, Patti Tay, pled guilty to the crime of Falsifying Business Records in the Second Degree.

The supporting affidavit from an investigator in the Manhattan D.A.'s Office stated:

in the County of New York and elsewhere, in or about November 2001 through October 2002, and thereafter, with intent to defraud and to commit another crime and to aid and conceal the commission thereof, made and caused to be made a false entry in the business records of Take-Two Interactive Software, Inc, ("TTWO") an enterprise, to wit, a spreadsheet maintained under the name MASTER OPTIONS.xls. Deponent states he is informed by defendant that: (1) from 1999 to 2006 defendant was TTWO's Comptroller, and from 2002 to 2005, she also held the title of Chief Accounting Officer; (2) during this period, TTWO issued stock options to provide substantial compensation to its directors, officers, and employees; (3) defendant prepared and maintained the records relating to the granting of and exercising of stock options, or had them prepared under her supervision, and that the records were maintained on an Excel spreadsheet named MASTER OPTIONS.xls that would be updated from time to time; (4) the spreadsheet did not always reflect the true grant dates for the options, but instead reflected artificial grant dates that were designed to insure that the exercise price would match the date treated as the grant price and that taking the required compensation expense or charge would be avoided; (5) defendant received options in the manner described above by which improper and artificial grant dates were recorded in the records of TTWO; (6) defendant was aware that there were accounting consequences when the exercise price of stock options is a price other than the market price of the stock on the date that the recipient and terms of a stock option grant were approved and consciously ignored the accounting consequences; and (7) the documentation TTWO provided its outside auditors and used in its financial statements reflected the artificial grant dates, i.e., dates other than when the terms of the stock option grants had been finally determined.

156.    In addition, Take-Two's former general counsel, Kenneth Selterman, pled guilty

to the crime of Falsifying Business Records in the Second Degree.  His plea agreement stated:

a) That, in March 2002, Kenneth Selterman, then General Counsel of TTWO received an official inquiry from "The NASDAQ Stock Market, Inc." ("NASDAQ") seeking to be informed, *inter alia*, whether options identified in TTWO's SEC 10K/A for TTWO's fiscal year ending October 31, 2001, in relationship to executive officers of TTWO were "covered under a stock option plan" and to identify the individuals and to specify the numbers of shares of those persons who are not so covered.

b) That, on or about March 6, 2002, Kenneth Selterman knowingly prepared a letter containing false information addressed to NASDAQ and which he caused to be sent and which did not reveal that TTWO's then CEO Kelly Sumner and President Paul Eibeler had "non-plan

options." In fact, as Mr. Selterman well knew, Mr. Sumner and Mr. Eibeler had received and possessed significant "non-plan options" at the time of the NASDAQ inquiry. Kenneth Selterman understood that the March 6, 2002, letter would be maintained in TTWO's books and records.

c) Kenneth Selterman also participated in a decision to change TTWO records to reflect that the options held by Mr. Sumner and Mr. Eibeler were options qualified as incentive options under TTWO's 1997 Stock Option Plan, rather than as "non-plan options" that did not qualify as incentive options.

### 6. The Widespread Nature of Backdating at Take-Two Provides Strong Circumstantial Evidence of Scienter as to Take-Two

157. As Take-Two has admitted, the backdating of employee stock options extended over a period of more than six years, and involved hundreds of stock option grants. The Company acknowledged (2006 Form 10-K, at 1), that from April 15, 1997 through June 2006, Take-Two issued approximately 1,100 stock option grants and that "the Company, in granting options, failed in many cases to comply with the terms of its Stock Option Plans, did not maintain adequate control and compliance procedures for option grants, and did not generate or maintain adequate or appropriate documentation of such grants."

158. The fact that options backdating, and other failures of internal controls with respect to the grant of employee stock options, occurred over a period of several years provides strong circumstantial evidence that senior executives at Take-Two in addition to Brant were complicit, or at the least, reckless, with respect to the granting of stock options and the filing of financial statements reflecting the false and fraudulent accounting therefor.

## VIII. LOSS CAUSATION

159. As detailed herein, throughout the Individual Action Period, and as this Court found in the Decision, the Defendants made material misrepresentations and omissions and

engaged in a scheme and course of conduct to deceive the market that resulted in artificially inflated prices for Take-Two common stock throughout the Individual Action Period.

160.    Plaintiff sold Take Two common stock short beginning in May of 2004 at prices averaging $23.38 per share. *See* Ex. E.

161.    Plaintiff "covered", or bought, Take-Two shares in March and April of 2005 at prices well below his sale prices, averaging $28.74 per share. *See* Ex. E.

162.    Defendants' continual misstatements during the Individual Action Period steadily inflated Take-Two's common stock prices. *See* Ex. D hereto. Indeed, immediately after every one of Defendants' misstatements discussed above, Take-Two stock *rose* in price. *See supra* at ¶4.

163.    In other words, Defendants' misstatements caused Take Two common stock to be artificially inflated by ever greater amounts by continually issuing new misstatements during the Individual Action Period.

164.    Since Plaintiff, as a short seller, bought his shares at artificially inflated prices, and at prices greater than his sale prices, he was injured. The difference in price between Plaintiff's sales and purchases – Plaintiff's purchases were made at greater artificial inflation than Plaintiff's sales – was caused by Defendants' misstatements.

**The July 10, 2006 Disclosure**

165.    This Court held in the Decision that the July 10, 2006 statement satisfied the causation element of Section 10(b). *See* Decision at 69. On that date, Take-Two announced that it had received notice from the SEC that it was conducting another investigation of the Company, this time into Take-Two's stock option grants from January 1997 to the present. The press release also announced that the Company had initiated an internal investigation into prior stock option grants. Immediately following these disclosures, the Company's stock dropped

approximately 7.5% from the prior day's closing price of $10.10 per share to $9.34 per share, in effect, reducing the Company's market capitalization by over $55.1 million.

166.    In a case like this, however, where a short seller is harmed in a manner markedly different than that of a garden-variety 10(b) case (where investors are generally harmed by selling shares *after* a corrective disclosure and accompanying stock drop), for all the reasons given above, injuries suffered before a corrective disclosure are compensable.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

167.    At all Individual Action times, the market for Take-Two's common stock was an efficient market for the following reasons, among others:

(a)    Take-Two's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Take-Two filed periodic public reports with the SEC and the NASDAQ;

(c)    Take-Two regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Take-Two was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

168.    As a result of the foregoing, the market for Take-Two's common stock promptly digested current information regarding Take-Two from all publicly available sources and reflected such information in Take-Two's stock price.  Under these circumstances, all purchasers of Take-Two's common stock during the Individual Action Period suffered similar injury through their purchase of Take-Two's common stock at artificially inflated prices and a presumption of reliance thus applies.

## X.    NO SAFE HARBOR

169.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Take-Two who knew that those statements were false when made.

34560v1                                        43

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

170.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

171.   This Count is asserted against all defendants for their violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

172.   During the Individual Action Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Individual Action Period, did: (i) deceive Plaintiff as alleged herein; (ii) artificially inflate and maintain the market price of Take-Two common stock; and (iii) cause Plaintiff to purchase Take-Two common stock at artificially inflated prices.

173.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Take-Two's common stock in violation of Section 10(b) and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

174.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and financial results of Take-Two as specified herein.

175.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Take-Two's value and performance and continued substantial growth.

176.   As alleged in greater detail above, the Individual Defendants' primary and controlling person liability arises from the following facts:  (i) they were high-level executives and/or directors at the Company during the Individual Action Period; (ii) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, they were privy to and participated in the creation, development and reporting of the Company's financial statements and reports; and (iii) they prepared and reviewed the Company's SEC filings and press releases disseminated to the investing public, and were aware of their contents, and they knew or recklessly disregarded that information contained therein was materially false and misleading.

177.   Further, as discussed herein, defendant Brant, while Chairman and CEO of the Company, developed the policy of improperly backdating stock options and was the primary beneficiary of the scheme, receiving a large number of backdated options.  As such, Brant knew that the dates of stock option grants to insiders at Take-Two were routinely manipulated to fall on days with the lowest stock prices and that this inflated the value of the options granted to him and other officers, directors and employees of Take-Two.

178.   Defendants Flug, Grace and Emmel participated in the backdating fraud by acting at least recklessly with respect to the granting of stock options.

179.     All Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and/or to disclose such facts, even though such facts were available to them.  The material misrepresentations and/or omissions described above were done knowingly or recklessly and for the purpose and effect of concealing Take-Two's operating condition and financial results from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by the persistent overstatements and misstatements of the Company's earnings throughout the Individual Action Period, as described above, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

180.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Take-Two's common stock was artificially inflated during the Individual Action Period.  In ignorance of the fact that market prices of Take-Two's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements described herein, or upon the integrity of the market in which the common stock trades, Plaintiff bought Take-Two common stock during the Individual Action Period at artificially high prices and was damaged thereby.

181.     At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Plaintiff known the truth regarding Take-Two's financial results, which was not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired his Take-Two common stock, or, if he had acquired such common stock

during the Individual Action Period, he would not have done so at the artificially inflated prices which he paid.

182.   By virtue of the foregoing, Defendants have violated Section 10(b), and Rule 10b-5 promulgated thereunder.

183.   As a direct and proximate result of the wrongful conduct alleged herein, Plaintiff suffered damages in connection with his respective purchases and sales of the Company's common stock during the Individual Action Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendant Brant)**

184.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

185.   This Count is asserted against defendant Brant for his violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

186.   This Court held in the Decision (*see id.* at 129) that Defendant Brant was a control person under Section 20(a).

187.   Defendant Brant served as a director or officer of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, substantial participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, this defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  Defendant Brant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiff to be misleading prior to issuance of these statements and

therefore had the ability to prevent the issuance of the statements or cause the statements to be

corrected.

188.　　Moreover, Defendant Brant had direct and supervisory involvement in the day-to-

day operations of the Company and, therefore, is presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein, and

exercised the same.

189.　　As set forth above, Defendant Brant violated Section 10(b) and Rule 10b-5 by his

acts and omissions as alleged in this Complaint.  By virtue of his position as controlling person,

Defendant Brant is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and

proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with

his purchases of the Company's common stock during the Individual Action Period.

**COUNT III**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

190.　　Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

191.　　Defendants have breached their fiduciary duties to Plaintiff.

192.　　As a result of their duties and responsibilities, as well as their conduct, as alleged

herein, Defendants have failed to fulfill their fiduciary duties owed to Plaintiff by acting in bad

faith, with gross negligence and in utter disregard for due care.

193.　　As a proximate result of Defendants' bad faith breach of fiduciary duties, Plaintiff

has sustained damages.

### COUNT IV
### For Unjust Enrichment
### (Against All Defendants)

194.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

195.    As a result of the misconduct detailed herein, Plaintiff has been harmed.

196.    Defendants reaped pecuniary benefits at the expense of Plaintiff.

197.    Defendants have therefore been unjustly enriched and equity and good conscience require that Defendants disgorge to Plaintiff all such unjust enrichment in an amount to be determined at trial.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    With respect to each Count, awarding compensatory damages in favor of Plaintiff against all defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other and further relief as the Court may deem just and proper.

## XII.    **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
      September 29, 2010

Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By:

Sandy A. Liebhard
(liebhard@bernlieb.com)
U. Seth Ottensoser
(ottensoser@bernlieb.com)
Joseph R. Seidman, Jr.
(seidman@bernlieb.com)
10 E. 40th St.
New York, NY  10016
(212) 779-1414