UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 7471 (RJS)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________
DATE FILED: 9/30/2011

ELI WILAMOWSKY,

Plaintiff,

VERSUS

TAKE-TWO INTERACTIVE SOFTWARE, INC., RYAN BRANT, TODD EMMEL, ROBERT FLUG, AND OLIVER GRACE,

Defendants.

OPINION AND ORDER
September 30, 2011

RICHARD J. SULLIVAN, District Judge:

On October 18, 2010, the Court approved the settlement of a securities fraud class action against Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"), its subsidiary, and several individual defendants arising from Take-Two's inclusion of sexually explicit content in a video game and the backdating of stock options granted to its directors and senior management. Plaintiff Eli Wilamowsky is a short seller of Take-Two stock who opted out of that settlement and brought this individual action because the plan of allocation excluded short sellers like him from recovery. (Compl. ¶ 1.) Now before the Court are Defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). For the reasons that follow, the motions are granted.

# I. BACKGROUND[1]

## A. Parties

Plaintiff Eli Wilamowsky short sold 924,500 shares of Take-Two stock between May 25, 2004 and April 21, 2005. (Compl. ¶¶ 132, 160-161; *id.*, Ex. E (Chart of Plaintiff's sales and purchases).) As a short seller, Plaintiff essentially bet that Take-Two stock was overvalued and slated to decrease in price, leading him to borrow and sell Take-Two stock under an obligation to later purchase (or "cover") and deliver the stock

---

[1] The following facts are drawn from the Complaint and exhibits attached thereto. The Court presumes the parties' familiarity with the facts of this case, which are fully discussed in Judge Kram's comprehensive opinion, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008), and the Court's preliminary approval of class settlement, No. 06 Civ. 803 (RJS) (S.D.N.Y. June 29, 2010) (Doc. No. 161). Accordingly, the Court recites only those facts pertinent to the resolution of this motion.

back to its owner. (*Id.* ¶ 3) Plaintiff alleges that before and after he made short sales, a series of Defendants' misrepresentations about the Company's stock options plans "continually, and increasingly, inflated Take-Two's stock price." (*Id.* ¶ 5.) Because these misstatements allegedly caused Plaintiff to cover his short positions at artificially higher prices than those at which he sold, Plaintiff allegedly suffered financial harm. (*Id.*)

Defendant Take-Two is a public company organized under the laws of Delaware that develops and distributes popular video games, hardware, and accessories. (*Id.* ¶¶ 27, 30.) The Company's corporate headquarters are located in New York and its stock is traded on the NASDAQ National Market. (*Id.*) The Complaint also names four Individual Defendants: Take-Two's founder and former CEO Ryan Brant ("Brant"), and former directors Todd Emmel, Robert Flug, and Oliver Grace (the "Directors"), who were all beneficiaries of Take-Two's alleged options backdating scheme. (*Id.* ¶¶ 31-35.)

B.  The Options Backdating Scheme

Although the settled shareholder securities class action involved claims related to both Take-Two's options backdating scheme and the inclusion of sexually explicit content in one of Take-Two's Grand Theft Auto video games, this individual case focuses solely on the options backdating scheme. Specifically, the Complaint alleges that between 1997 and 2005, Take-Two operated two stock option plans to compensate its directors and officers, including the Individual Defendants. (*Id.* ¶¶ 51-53, 59.) According to the Complaint, Take-Two routinely manipulated the dates of its stock option grants to make them fall on days with the lowest stock prices, thereby inflating the value of the grants. (*Id.* ¶¶ 59-60.) The Company thus effectively granted options with an exercise price below the market price of the underlying shares on the date of grant, referred to as "in-the-money" grants. (*Id.* ¶ 99.) Significantly, Take-Two failed to account for these in-the-money grants as compensation expenses pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), and violated Generally Accepted Accounting Principles ("GAAP"). (*Id.* ¶¶ 97-100.) As a result, Take-Two understated compensation expenses and overstated net income in its press releases and SEC filings. (*Id.* ¶¶ 131, 139.) The scheme resulted in an overstatement of Take-Two's earnings by 20% in fiscal year 2002, 11% in fiscal year 2003, and 5-6% in fiscal years 2004 and 2005. (*Id.* ¶ 89.)

According to the Complaint, the "truth about Take-Two's option backdating was finally revealed on July 10, 2006," when Take-Two announced that the SEC was investigating its option grants and that it had initiated its own internal investigation. (*Id.* ¶ 140.) On this news, Take-Two's stock dropped approximately 7.5% from the prior day's closing price of $10.10 per share to $9.34 per share. (*Id.*) Subsequently, in December 2006 and January 2007, Take-Two completed an internal investigation that revealed (1) a pattern and practice of backdating options (particularly by Brant), and (2) failure to comply with the terms of its stock option plans, as well as failures to maintain adequate control and compliance procedures and accurate documentation of option grants. (*Id.* ¶¶ 72-74.) On February 14, 2007, Brant pled guilty to a felony charge of falsifying business records in New York State Supreme Court, New York County, and entered into a civil settlement with the SEC. (*Id.* ¶ 17.) On February 23, 2007, Take-Two announced that options granted to several directors, including

Emmel, Flug, and Grace, were "improperly dated" and that each of the directors had entered into an agreement to repay the compensation that they had unlawfully obtained. (*Id.* ¶ 18.)

C. Plaintiff's "Individual Action Period"

Plaintiff's self-styled "Individual Action Period" extends from March 4, 2004 through July 16, 2006 (*id.* ¶ 3), beginning with the first of nine alleged Take-Two misstatements (*id.* ¶ 109) and ending six days after the truth was revealed to the market on July 10, 2006 (*id.* ¶ 140).[2] However, Plaintiff's trading was confined to a much smaller 11-month period between May 25, 2004 and April 21, 2005. (*Id.* ¶¶ 160-161; *id.*, Ex. E.) Specifically, beginning in May 2004 and mostly ending in January 2005,[3] Plaintiff sold Take-Two stock "short" at prices averaging $23.38 per share.[4] (*Id.* ¶ 160.) Plaintiff subsequently covered his short positions by purchasing 924,500 shares in March and April of 2005 at an average price of $28.74 per share. (*Id.* ¶¶ 132, 161.) Plaintiff seeks to recover the difference between these average prices (*id.* ¶ 164), alleging that Take-Two's "consistent misstatements continually, and increasingly, inflated Take-Two's stock price during the Individual Action Period" (*id.* ¶ 5).

The first two of these misstatements, a March 4, 2004 press release announcing Take-Two's financial results for the first fiscal quarter of 2004, and a March 16, 2004 SEC Form 10-Q filing, occurred *prior to* Plaintiff's first sales of Take-Two stock. The press release reported that the Company's quarterly net income was $31.8 million. (*Id.* ¶ 109.) The 10-Q stated in relevant part:

> In the opinion of management, the financial statements reflect all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of the Company's financial position, results of operations and cash flows. . . . The Company accounts for its employee stock option plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").

(*Id.* ¶ 112-13.)

The remaining seven misstatements similarly involve pairs of (1) press releases reporting financial results in advance of SEC filings and (2) the SEC filings themselves, reiterating the results and restating the accuracy of Take-Two's financial statements and its compliance with APB 25. (*See id.* ¶¶ 115-38 (June 8, 2004 Press Release, June 14, 2004 10-Q, September 9, 2004 Press Release, September 14, 2004 10-Q, December 22, 2004 10-K, March 3, 2005

[2] For the reader's ease, the Court annexes to this opinion a chart prepared by Defendants reflecting the relevant misstatements, Plaintiff's stock transactions, and stock price changes during the "Individual Action Period." *See* First Decl. of John V. Ponyicsanyi, dated January 14, 2011, Doc. No. 28 ("Ponyicsanyi Decl."), Ex. 2. Plaintiff does not dispute the accuracy of the chart, which is based on the Complaint and judicially-noticeable facts. *See Collier v. Aksys Ltd.*, No. 04 Civ. 1232 (MRK), 2005 WL 1949868 (D. Conn. Aug. 15, 2005) (attaching a price chart).

[3] Although the vast majority of Plaintiff's short sales were completed by January 24, 2005, he sporadically continued to short the stock while engaging in covering purchases in March and April 2005. For instance, Plaintiff shorted 5,000 shares on March 23, 2005 and 7,000 shares on April 12, 2005.

[4] On April 15, 2005, Take-Two undertook a 3:2 stock split. (*See* Compl., Ex. A.) Unless otherwise noted, the Court refers to the adjusted close price for all stock prices, as do the parties. (*See id.*, Ex. D.)

Press Release and March 10, 2005 10-Q).)[5] Five of these alleged misstatements occurred during Plaintiff's selling period between May 25, 2004 and January 24, 2005, when Plaintiff was betting that the market overvalued Take-Two stock. This selling period was followed by a holding period between January 25, 2005 and March 2, 2005, during which Plaintiff did not sell or purchase any Take-Two stock and Take-Two did not issue any alleged misstatements. (*Id.*, Ex. E.) The price of Take-Two shares, however, rose approximately 13% during the holding period. (*Id.*, Ex. D.) Plaintiff began to cover his earlier sales on March 3, 2005, and concluded his covering purchases by April 21, 2005. In the early part of this purchasing period, Take-Two issued its two final alleged misstatements: a March 3, 2005 Press Release announcing its first quarter financial results, and a March 10, 2005 SEC 10-Q filing detailing those results.

D. Procedural History

As noted above, prior to opting out of the class settlement, Plaintiff was a putative member of a consolidated class action captioned *In re Take-Two Interactive Securities Litigation*, No. 06 Civ. 803 (S.D.N.Y). The first of the cases comprising that consolidated action was filed on February 2, 2006 and assigned to the Honorable Shirley Wohl Kram, United States District Judge. On April 16, 2006, lead plaintiffs filed the Consolidated Second Amended Class Action Complaint ("SAC"). By Memorandum and Order dated April 16, 2008, Judge Kram denied in part and granted in part a motion to dismiss the SAC and granted lead plaintiffs leave to amend. Lead plaintiffs filed the Consolidated Third Amended Class Action Complaint on September 15, 2008. Following Judge Kram's death, the case was reassigned to my docket.

Subsequently, the parties entered into a $20,115,000 cash settlement, and on June 29, 2010, the Court preliminarily approved a class for settlement purposes. The Plan of Allocation specifically excluded short sellers like Plaintiff from receiving any of the settlement fund. (*See* Compl., Ex. B ("Proof of Claim") at 2 ("Any person or entity that sold Take-Two common stock 'short' shall have no Recognized Loss with respect to any purchase during the Class Period or SEC Claims Period to cover such short sale.").) Although Plaintiff did not object to the settlement, he became the sole person to exclude himself from the class, which numbered upwards of 170,000 people. (*See* Aff. of Stacey B. Fishbein dated Oct. 5, 2010, 06 Civ. 803, Doc. No. 174 ¶¶ 5-6.) The Court approved the final settlement, plan of allocation, and application for attorney's fees on October 18, 2010.

On September 29, 2010, Plaintiff filed a four-count Complaint in this individual action. Count One alleges that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder; Count Two alleges that Defendant Brant violated Section 20(a) of the Exchange Act; and Counts Three and Four allege common law claims of breach of fiduciary duty and unjust enrichment against all Defendants in connection with their issuance and receipt of improper stock grants. On December 14, 2010, the Court held a pre-motion conference relating to Defendants'

[5] As described *infra*, one exception to Plaintiff's pairing of actionable press releases and SEC filings is a December 16, 2004 press release issued in advance of the December 22, 2004 10-K, which Plaintiff does not cite as a misstatement. As Plaintiff acknowledges, Take-Two's stock price *declined* after that misstatement. (Pl.'s Opp'n 15.)

contemplated motion to dismiss the Complaint. Subsequently, on January 14, 2011, Defendants filed three separate motions to dismiss. The motions were fully briefed as of February 28, 2011.[6]

## II. LEGAL STANDARDS

### A. Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Securities Fraud

A securities fraud complaint must also comply with the heightened pleading standards imposed by Rule 9(b) and the PSLRA. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To meet this standard, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

The PSLRA, in turn, sets forth additional pleading requirements. To this end, "[t]he statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)).

## III. DISCUSSION

### A. Section 10(b) Claim

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff

[6] In resolving the instant motions, the Court has considered the Complaint, any written instrument attached to the Complaint or documents incorporated therein by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and documents upon which Plaintiff relied in bringing the suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court has also considered Take-Two's Memorandum of Law in Support of the Motion to Dismiss ("Take-Two's Mem."); Brant's Memorandum of Law in Support of the Motion to Dismiss ("Brant's Mem."); the Directors' Memorandum of Law in Support of the Motion to Dismiss ("Directors' Mem."); Plaintiff's Omnibus Memorandum of Law in Opposition ("Pl.'s Opp'n"); Take-Two's Reply; Brant's Reply; and the Directors' Reply, as well as the various declarations and exhibits filed alongside these documents.

must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura*, 544 U.S. at 341-42).

Defendants separately move for dismissal of the Section 10(b) claim on the grounds that the Complaint fails to sufficiently plead (1) a material misstatement or omission attributable to Emmel, (2) a strong inference of scienter among the Directors, and (3) loss causation. Because the Court agrees that the Complaint fails to sufficiently plead loss causation, it does not assess the remaining grounds for dismissal.

1. Loss Causation Standard

A securities fraud plaintiff is required to "prove both transaction causation (also known as reliance) and loss causation." *ATSI Commc'ns*, 493 F.3d at 106 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). "Transaction causation only requires allegations that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Id.* In this case, Plaintiff alleges reliance based on the fraud-on-the market presumption for securities sold on an efficient market (Compl. ¶¶ 167-68), and Defendants do not dispute that such a presumption applies to short sellers. *See generally Basic v. Levinson*, 485 U.S. 224, 248 (1988) ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."). Accordingly, transaction causation is not in dispute here.

By contrast, loss causation is the proximate causal link between the defendant's alleged misconduct and the plaintiff's economic harm. *See ATSI Commc'ns, Inc.* 493 F.3d at 106; *Dura,* 544 U.S. at 346. This requirement is codified in the PSLRA, which imposes on a plaintiff in a private securities action "the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Loss causation requires "both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173 (emphasis in original). "[T]o establish loss causation in a securities case, a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (emphasis in original (internal citation omitted)). The Second Circuit has articulated several possible methods of pleading loss causation in securities cases, including the "corrective disclosure" theory and the "materialization of risk" theory. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) ("Establishing either theory as applicable would suffice to show loss causation."). The first and more common way to plead loss causation requires an allegation that "the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing *Lentell*, 396 F.3d at 175). Under this method, a plaintiff must tie his loss to the dissipation of an inflated (or deflated) price upon a disclosing event that

reveals the false information to the market. *See In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).

Alternatively, in the absence of a corrective disclosure, loss causation may be alleged "by showing 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Omnicom Grp.*, 597 F.3d at 513 (quoting *ATSI Commc'ns*, 493 F.3d at 107); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) ("[I]n order to prove loss causation, any plaintiff who sold their stock prior to the [corrective] disclosure must prove that the loss they suffered was both foreseeable and caused by the 'materialization of the concealed risk.'"). Thus, "[w]here the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss." *Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d at 289 (internal citation and quotation marks omitted); *see, e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 2005 WL 1527674 (S.D.N.Y. 2005) (loss causation sufficiently pled where a series of fraudulent transactions caused the company's liquidity problems and ensuing loss).

In *Dura Pharmaceuticals*, the Supreme Court held that in ordinary fraud-on-the-market cases, an "inflated purchase price [of a security] will not itself constitute or proximately cause the relevant economic loss." *Dura*, 544 U.S. at 342. The plaintiffs in *Dura* did not allege that they held their stock through a corrective disclosure that resulted in a price decline, but instead merely alleged that "[i]n reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities" and "suffered 'damage[s]' thereby." *Id.* at 340 (alterations in original). A unanimous Supreme Court cited several reasons why such "inflated purchase price" allegations were insufficient to plead loss causation. First, the Court observed that in the ordinary securities case, a plaintiff suffers no loss at the moment of purchase because "inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Id.* at 342. Second, the Court recognized that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong," because any future decline in share price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 342-43. With "[o]ther things being equal," the Court stated, "the longer the time between the purchase and sale . . . the more likely that other factors caused the loss." *Id.* at 343. In light of the broad "tangle of factors affecting price," the Court held that an allegation of an inflated purchase price alone at most "touches upon" a later economic loss, and does not *cause* a loss, as 15 U.S.C. § 78u-4(b)(4) requires. *Id.* To find otherwise, the Court concluded, would be to vitiate the objective of Section 10(b), which is intended "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345.

The *Dura* Court did not decide whether loss causation in securities fraud cases must be pled with the specificity required by Rule 9(b) or the heightened pleading standards of the PSLRA, "assum[ing], at least for argument's sake, that neither the Rules nor the securities statutes impose any special

further requirement in respect to the pleading of proximate causation or economic loss." *Id.* at 346. Therefore, the Court's conclusion that "inflated purchase price" allegations were insufficient to plead loss causation applied the then-operative "no set of facts" articulation of Rule 8's notice pleading standards. *Id.* (citing *Conley v. Gibson*, 355 U.S. 41 (1957)); *see Conley*, 355 U.S. at 45-46 ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Of course, subsequent to *Dura*, the Supreme Court has clarified that even Rule 8 pleadings must meet a "facial plausibility" standard, which applies to the loss causation allegations here.[7] *Iqbal*, 129 S. Ct. at 1949. Thus, Plaintiff must plead sufficient factual content to allow a reasonable inference to be drawn connecting Take-Two's misconduct to his loss.

2. Application to Plaintiff's Claims

Consistent with *Dura*, there is no question that a short seller can allege an actionable economic loss by making covering purchases following a corrective disclosure, although the nature of the misstatement, the corrective disclosure, and the corresponding movement of stock prices would all be inverted from the standard long-investor model. *See Collier v. Aksys Ltd.*, No. 04 Civ. 1232 (MRK), 2005 WL 1949868 (D. Conn. Aug. 15, 2005), *aff'd* 179 F. App'x 770 (2d Cir. 2006). Thus, the actionable misstatement in the short-selling context would conceal positive rather than negative information about the company – such as the pendency of a favorable merger – and would depress rather than inflate stock prices. An investor short selling stock at these artificially low prices would plainly suffer an economic loss when the truth was revealed to the market, boosting the prices at which he was forced to cover. *See id.* at *11 ("[I]n order to adequately plead loss causation, [plaintiff] would have to plead with specificity that: (a) Defendants' misstatements and omissions in their SEC filings . . . kept the price of . . . stock artificially *low* (not high) at the time they were short selling the stock; (b) the price of . . . stock *rose* (not fell) after materialization of the concealed risk; and (c) [plaintiff] suffered financial losses that were causally linked to the revelation of the previously undisclosed information when he had to cover at the *higher* (not lower) prices."). By contrast, where, as alleged here, a company concealed *negative* information about its economic condition, a short seller who sold at artificially inflated prices and covered after the corrective disclosure would actually *profit* from the fraud.

Of the few securities fraud cases directly addressing loss causation in the context of short selling, *Collier v. Aksys* is instructive. In *Collier*, Judge Kravitz dismissed claims made on behalf of a class of short sellers for failing to sufficiently plead loss causation. 2005 WL 1949868, at *16. The complaint

[7] The question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit, but the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8. *See King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010) ("[P]laintiffs need only meet the lesser Rule 8(a) standard when pleading loss causation."), *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) ("[N]early all courts addressing the [loss causation] issue since [*Dura*] have also applied Rule 8, rather than the heightened pleading standard of Rule 9."); *but see Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 432 n.9 (S.D.N.Y. 2010) ("Requiring that loss causation be pled under Rule 9(b) is consistent with the language of the rule itself, which requires that all circumstances of fraud, except for intent, be pled with particularity.").

alleged that several hedge fund defendants deliberately concealed their dramatically rising ownership of Aksys in order to artificially deflate the stock price. *Id.* at *3-4. As defendants increased their ownership interest from 8% to 77% over the course of nearly 18 months, they failed to file the requisite disclosure forms under Section 13 of the Securities Exchange Act, and – in the forms they did file – allegedly misrepresented their true intentions regarding control of Aksys. *Id.* at *6-7. The representative plaintiff was allegedly harmed by the scheme by paying higher purchase prices than his sale prices when he covered (1) before the curative revelation and (2) seven months afterwards. *Id.* at *13. Scrutinizing the pleadings, Judge Kravitz observed that the allegations of deliberate artificial deflation were belied by the fact that the price "rose dramatically throughout most of the class period." *Id.* at *11 (citation omitted). "This dramatic rise in Aksys' stock price," the court stated, "can hardly be considered a clear sign that the stock was being kept artificially low." *Id.* Indeed, the actual stock movement in *Collier* resembled that of a standard misrepresentation case: the stock increased during the misrepresentation period, and plummeted 50% after a corrective disclosure. *See id.* at *12. Recognizing that "at least in theory," the short seller could have alleged that the stock was rising less than it would have but for the misstatements, Judge Kravitz nevertheless concluded that the plaintiff's pre-revelation covering purchases failed to establish loss causation as a matter of law:

> According to *Lentell*, any losses associated with those pre-revelation cover purchases could not be causally linked to the misstatements and omissions, because the truth relating to Defendants' ownership of Aksys stock had not yet been revealed to the market. *See Lentell*, 396 F.3d at 175 n. 4 ("[Defendant's] concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public."). . . . In essence, any losses associated with these pre-disclosure cover purchases are the equivalent to a bare allegation of purchase-time value disparity, which cannot by itself demonstrate loss causation.

*Id.* at *13 (internal citation omitted). The court also found that losses from covering purchases that occurred seven months *after* a corrective disclosure, when the price eventually rebounded, were "simply too remote in time to be causally linked" to prior misrepresentations. *Id.* at *13. Finding the opinion "well-reasoned," the Second Circuit summarily affirmed it for the reasons stated in the opinion. *Collier*, 179 F. App'x. at 771.

As Plaintiff acknowledges, his transactions in Take-Two stock ended fourteen months *prior to* the relevant curative disclosure, and thus do not implicate the straightforward application of *Dura*'s principles to an inverted corrective disclosure model. As a result, Plaintiff strains to distinguish his pre-disclosure transactions from those found to be insufficient in *Collier*, pointing out that the investor in that case "sold short and covered, back and forth, continually throughout the class period, presumably receiving in sales proceeds the same artificial inflation he received when buying." (Pl.'s Opp'n 11-12.) Of course, Plaintiff himself actually engaged in 12,000 shares' worth of short sales in March and April 2005 *while* he was covering his larger previous sales, thus obscuring any difference between Plaintiff and the *Collier*

plaintiff. But even leaving aside that fact, Plaintiff fails to demonstrate why his more distinct sequence of sales and purchases is not likewise "equivalent to a bare allegation of purchase-time value disparity," *Collier*, 2005 WL 1949868, at *13, that typically dooms claims by in-and-out purchasers. *See Flag Telecom Holdings*, 574 F.3d at 40-41 (concluding that in-and-out traders who transacted prior to a corrective disclosure must be excluded from the certified class because they could not even "conceivably" allege loss causation as a matter of law and should not have been included in the certified class).

Nor has Plaintiff alleged that he was harmed by the "materialization of the risk concealed by the fraudulent statement." *Omnicom Grp.*, 597 F.3d at 513. In this case, the "risk concealed" is that Defendants allegedly "backdat[ed] and re-pric[ed] employee stock options to provide illegal, windfall profits to senior executives and members of Take-Two's board of directors." (Compl. ¶ 13). Plaintiff has not attempted to allege that the scheme *itself* – rather than any attendant misstatements – caused his economic loss. (*Cf.* Compl. ¶ 164 ("The difference in price between Plaintiff's sales and purchases – Plaintiff's purchases were made at greater artificial inflation than Plaintiff's sales – was caused by Defendants' *misstatements*." (emphasis added)).) Nor does Plaintiff argue that this fraud-on-the-market case is premised on market manipulation. *See Collier*, 2005 WL 1949868, at *12. ("Because this case is founded on material misstatements or omissions and not on manipulation . . . mere allegations of purchase-time value disparity between the price paid for a security and its true investment quality are insufficient, without more, to establish loss causation.").

Rather, Plaintiff broadly asserts that "plaintiffs can plead loss causation in a variety of ways," citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management., LLC*, 595 F.3d 86 (2d Cir. 2010). (Pl.'s Opp'n 1-2.) However, *Operating Local* involved a materialization of risk scenario dissimilar to this pure misstatement action. There, defendants concealed that they were siphoning excessive fees from certain funds, plausibly causing plaintiffs to invest in the funds and suffer directly ascertainable losses when the fees were deducted. 595 F.3d at 96. Accordingly, the "losses were real ones because the deductions used to fund the transfer agent 'fees' diminished for [plaintiffs] . . . (and other shareholders) money under management and, as a result, negatively and predictably impacted returns." *Id.* As noted above, Plaintiff's allegations of economic loss here are premised solely on the mere *issuance* of material misstatements and omissions, and not on the materialized impact of the actual options backdating scheme on Take-Two stock.

Plaintiff contends that this measure of harm is enough, arguing that as a short seller, he was damaged at the time of his covering purchases rather than after the truth was revealed to the market as in a "garden-variety Section 10(b) situation." (Pl.'s Opp'n 1, 13.) Although this is true as a purely descriptive matter – Plaintiff obviously experienced losses on the days he covered his earlier short sales – he cannot plausibly articulate why those losses are attributable to Defendants' misstatements and omissions, which would not be revealed to the market for more than a year. Put another way, Plaintiff fails to plausibly "disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific

or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." *Telecom Holdings*, 574 F.3d at 36 (quoting *Dura*, 544 U.S. at 342-43). These legitimate market circumstances and intervening events can just as readily animate stock movements for a short seller's inverted sequence of sales and purchases as they do for a traditional purchaser. This is particularly so here, where the in-and-out stock transactions began after the stock price was *already* inflated, spanned an extended time period punctuated by constant legitimate market stimuli and repeated misstatements, and terminated more than a year prior to the corrective disclosure. *Cf. In re Sec. Capital Assurance, Ltd. Sec. Litig.*, No. 07 Civ. 11086 (DAB), 2010 WL 1372688, at *30 (S.D.N.Y. Mar. 31, 2010) (loss causation inadequately alleged where the allegations "incorporate[d] intervening events and actors, and at times present[ed] (rather inexplicably) wide event windows that welcome[d] into their narrative noise and information from other events that ma[de] it difficult to isolate the impact of Defendants alleged misrepresentations, and their revelation to the market."). Because under these circumstances, the "relationship between the plaintiff's investment loss and the information misstated" is highly "attenuated," the fraud claim may not lie. *Lentell*, 396 F.3d at 174 (internal citations and quotations omitted).

A closer inspection of Plaintiff's "Individual Action Period" illustrates his failure to link his losses to Take-Two's material misrepresentations and omissions. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) ("While plaintiffs need not quantify the fraud-related loss, they must 'ascribe some rough proportion of the whole loss to [the alleged] misstatements.'" (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)). To begin, Plaintiff alleges that the options backdating scheme began in 1997 (Compl. ¶ 157), causing a substantial overstatement of Take-Two's earnings in the years *prior to* his transactions. (*See id.* ¶ 89 (alleging that Take-Two's earnings were overstated by 20% in fiscal year 2002, 11% in fiscal year 2003, and 5-6% in fiscal years 2004 and 2005).) Indeed, Plaintiff alleges that "Take-Two's improper accounting for options rendered the financial results set forth in *all* SEC annual and quarterly reports, and the press releases reporting such results, materially false and misleading." (*Id.* ¶ 102 (emphasis added).) Take-Two's share prices were thus already substantially inflated before Plaintiff began to short sell in May 2004, and unbeknownst to him, vindicated his view that the stock was overvalued. As a matter of logic, Plaintiff cannot show harm with respect to the two March 2004 misstatements that *preceded* his short selling. By covering prior to a corrective disclosure, Plaintiff at most paid back the same inflation he received in his sale prices. If, on the other hand, Plaintiff had covered after a corrective disclosure, he would have *profited* from Take-Two's fraud and the post-disclosure price drop.

Plaintiff implausibly presses a "continual inflation" theory with respect to the remaining misstatements, alleging that each statement *further* inflated Take-Two stock prices and caused his loss. Plaintiff's theory suffers from several flaws. First, every SEC filing cited in the Complaint contained the same language about Take-Two's accounting for executive compensation, making it highly unlikely that the attendant price increases were caused by the repetition of that information. As for the misrepresentations that *did* vary – namely Take-Two's reported net income and compensation costs – Plaintiff fails to disaggregate their impact on

his loss from prior misstatements and legitimate news affecting Take-Two stock prices. Significantly, Plaintiff's continual inflation theory is contradicted by the fact that Take-Two's share price actually *declined*, rather than increased, following other Take-Two statements containing similar misrepresentations. *See* First Decl. of John V. Ponyicsanyi, dated January 14, 2011, Doc. No. 28 ("Ponyicsanyi Decl."), Ex. 14 (collecting statements); Ex. 3 (reporting stock price movements). For instance, as Plaintiff acknowledges, the stock fell after a December 16, 2004 press release (omitted from the Complaint) that announced the same financial results as the December 22, 2004 10-K (included in the Complaint). (Pl.'s Opp'n 15.)[8] The obvious inference derived from these varied stock reactions is that the upward price movement following Plaintiff's nine cherry-picked statements was caused by the broad "tangle" of non-culpable positive information rather than Take-Two's false affirmations relating to its executive compensation. *Cf. In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent . . . .").

Moreover, Take-Two did not issue *any* inflationary misstatements between the last day of Plaintiff's primary selling period, January 24, 2005, and the beginning of his covering purchases on March 3, 2005. Yet between those dates, the stock price rose 13.23% from $22.30 to $25.25.[9] Plaintiff entirely fails to acknowledge the effect of this legitimate price increase on his losses. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("If one of [the legitimate intervening] . . . factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent."). Finally, even if the misstatements *themselves* were construed as the "materialization of the concealed risk" for a short seller, the overwhelming majority of Plaintiff's purchases took place more than a month after the issuance of the last misstatement, a near eternity in the market that makes his loss particularly attenuated. *Cf. Dura*, 544 U.S. at 342-43 ("If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. . . . Other things being equal, the longer the time between purchase and sale, the more likely that . . . other factors caused the loss.").

Plaintiff contends that any effort to disaggregate his losses from the tangle of

---

[8] Plaintiff discounts this and other statements identified by Defendants as "simply irrelevant," stating that the "Court has to weigh the Complaint – not what Take-Two believes Plaintiff could have alleged." (Pl.'s Opp'n 16.) But "although these documents are not mentioned on the face of the complaint," it is well established that "on a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken, including 'the *fact* that press coverage . . . or regulatory filings contained certain information, without regard to the truth of their contents.'" *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis in original)). The Court may also take judicial notice of publicized stock prices. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000). In any event, while these statements illustrate the implausibility of Plaintiff's loss causation theory, the Court's conclusion does not depend on them.

[9] Having sold Take-Two at an average price of $23.38 (Compl. ¶ 160), Plaintiff thus could have earned an immediate profit by covering at $22.30 at the beginning of the holding period. That Plaintiff chose to wait as the price spiked due to indisputably legitimate market forces during the holding period undermines any plausible causal link between the alleged misconduct and his harm.

factors influencing price is "premature" on a motion to dismiss because it involves an "inherently factual" inquiry. (Pl.'s Opp'n 13-14.) Such a rationale, however, would call for courts to sidestep analysis of essentially *any* loss causation pleadings until summary judgment – a result at odds with *Dura* and the Court's obligation to analyze whether a pleading contains sufficient "*factual content* . . . to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1937 (emphasis added).

Finally, Plaintiff points to out-of-circuit case authorities that do not warrant a different conclusion in this matter. (*See* Pl.'s Opp'n 8-10 (citing *Rocker Mgmt. L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, No. Civ. A. 00-5965 (JCL), 2005 WL 1366025, at *1 (D.N.J. June 8, 2005) and *Levie v. Sears Roebuck & Co.*, 496 F. Supp. 2d 944, 948 (N.D. Ill. 2007).) The plaintiffs in *Rocker* were hedge funds who shorted the defendant company's stock and publicly voiced their opinion that it was overvalued. *Rocker Mgmt. L.L.C.*, No. Civ. A. 00-5965, Am. Compl. ¶ 6, Doc. No. 101 (D.N.J. Apr. 8, 2002). Subsequently, company management allegedly engaged in a fraudulent conspiracy to "squeeze the shorts" out of the market by raising the price of the stock well beyond the acceptable level of risk for short sellers. *Id.* In that vein, the defendants allegedly issued false financial statements that caused the stock price to double or triple from the prices at which plaintiffs sold short, forcing them to cover prior to a corrective disclosure. *Id.* In a brief discussion issued approximately six weeks after *Dura*, the court stated that it was "satisfied that the allegations relating to transaction causation in this short-selling context are sufficient to withstand a motion to dismiss based on loss causation. In the short-selling context, losses caused by artificially inflated stock prices are incurred at the time of cover. (This differs from the typical fraud-on-the-market scenario where purchasers buy at a fraudulently inflated price and then the stock subsequently drops once the truth is revealed to the market.)" 2005 WL 1366025, at *7. The court accepted the inference drawn from the complaint that "the false financial statements artificially inflated L & H stock, which, in turn, *forced* Plaintiffs to make cover transactions and incur significant losses." *Id.* (emphasis added). The court then concluded that "[f]act-intensive issues related to causation and whether a given misstatement 'substantially contributed' to Plaintiffs' losses, are not properly resolved at this juncture." *Id.* (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 177, 181 n.24 (3d Cir. 2001)). Of course, unlike the short sellers in *Rocker*, Plaintiff began his short sales well after the prices were already inflated, and makes no allegations of a subsequent scheme by Take-Two to manipulate prices in order to force short sellers like him to prematurely cover. Nor is it clear whether *Rocker*'s hesitation to analyze loss causation pleadings was informed by more liberal pre-*Twombly* pleading standards or its application of the Third Circuit's pre-*Dura* "substantial contribution" test, which has not been adopted in this Circuit. In any event, *Rocker* is not binding on the Court, and the Court finds it inapplicable here in the post-*Twombly* world of the Second Circuit.

Plaintiff's other authority, *Levie v. Sears*, involved allegations that Sears and Kmart fraudulently concealed their pending merger, artificially deflating Sears' stock price. 496 F. Supp. 2d at 948-49. In determining the scope of a class to be certified, the court included pre-disclosure regular sellers, but excluded short sellers who covered prior to a disclosure and thus "benefitted from the

artificially low price at the time of the covering purchase." *Id.* at 949. In including regular in-and-out investors in the certified class, the court reasoned that:

> [A]ny investor who sold (during the class period) before the fraud was revealed incurred injuries because that investor sold at a price that was artificially lower than the investor should have received. Regardless of the price such an investor paid for the stock, the price would have been higher at any point after the (secret) merger negotiations became material and before the merger plans were disclosed.

*Id.* at 948.

Although Plaintiff seeks to analogize his situation to that of the in-and-out seller class, the court did not distinguish between (1) persons who purchased stock at a legitimate price before a misstatement, and (2) those who bought stock after a misstatement, and so benefitted on the front end from an artificially low price. As such, the Court finds *Levie* inapposite with respect to the circumstances of this case, which includes no less than seven of nine misstatements allegedly inflating the prices before and during Plaintiff's short selling period. Moreover, *Levie* was decided in the context of class certification, where, as was recently reaffirmed by the Supreme Court, a plaintiff need not establish loss causation. *See Erica P. John Fund, Inc.*, 131 S. Ct. at 2183; *cf. Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010) (noting that short sellers can be included in a certified class even if "[i]t may turn out that the shorts do not suffer compensable losses," disagreeing with the Fifth Circuit that proof of loss causation was essential to class certification, and stating that under Rule 23, "a certified class can go down in flames on the merits").

Ultimately, as in *Collier*, Plaintiff appears to have voluntarily chosen to cover his previous short sales near the peak of Take-Two stock prices "based on his own guess that the stock would continue to precipitously rise." *Collier*, 2005 WL 1949868, at *12 n.8. As it turned out, Plaintiff's bet on the direction of Take-Two stock did not pay off. With hindsight, Plaintiff may wish that he either covered immediately at the end of his short-selling period in January 2005, when the stock fell below his average sale price, or waited until after the corrective disclosure, by which point the price declined enough to put him in a position to earn millions of dollars.[10] But allowing him to state a claim under these circumstances would permit a short seller in *any* standard misrepresentation case to either win big in the marketplace by covering after a corrective disclosure, or win in court by "transform[ing] a private securities action into a partial downside insurance policy." *Dura*, 544 U.S. at 347-48. Because the securities laws do not stand for such a result, the Court concludes that Plaintiff's Section 10(b) claim fails to plausibly allege loss causation.

B. Section 20(a) Claim

The Complaint also asserts a claim against Brant pursuant to Section 20(a) of the Exchange Act. Section 20(a) imposes liability on individuals who control Section 10 violators. *See* 15 U.S.C. § 78t(a). To assert a *prima facie* case under Section 20(a), a plaintiff "must show a primary violation by

[10] Indeed, had Plaintiff waited to cover until July 10, 2006, when (following a period of substantial decline in 2005 and 2006) Take-Two's stock fell to $9.34 per share, he would have stood to gain a total profit of approximately $13 million.

the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal citations and quotation marks omitted). Because the Complaint has not stated a primary violation under Section 10(b) and Rule 10b-5, the Section 20(a) claim must likewise be dismissed. *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).

C. State Law Claims

Counts Three and Four of the Complaint assert state law claims against all Defendants for breaches of fiduciary duties and unjust enrichment. Defendants argue that these claims (1) are preempted by New York's Martin Act, and can only be brought by the New York Attorney General, and (2) constitute derivative claims, which Plaintiff lacks standing to bring. The Court agrees on both points.

1. Martin Act Preemption

The Martin Act, N.Y. Gen. Bus. Law § 352 *et seq*, "prohibits various fraudulent and deceitful practices in the distribution, exchange, sale, and purchase of securities but does not require proof of intent to defraud or scienter." *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 36 (S.D.N.Y. 2008). New York courts have held that the Martin Act vests in the New York Attorney General the sole authority for prosecuting state law securities violations sounding in fraud, and contains no implied right of action. *See Barron v. Igolnikov*, No. 09 Civ. 4471 (TPG), 2010 WL 882890, at *5 (S.D.N.Y. Mar. 10, 2010). Although "the New York Court of Appeals has not explicitly addressed the preemption of non-fraud common law claims that fall within the scope of the Martin Act, . . . the overwhelming majority of courts to consider the issue," including this Court, "have found that such claims are preempted." *Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 431 (S.D.N.Y. 2010) (dismissing claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, gross negligence, unjust enrichment, and breach of contract); *see also Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 380-81 (S.D.N.Y. 2011) (dismissing negligent misrepresentation claims as preempted by the Martin Act); *Owens v. Gaffken & Barriger Fund, LLC*, No. 08 Civ. 8414 (PKC), 2009 WL 3073338, at *14 (S.D.N.Y. Sept. 21, 2009) (finding an unjust enrichment claim to be "merely a recast securities fraud claim" and therefore precluded by the Martin Act); *Heller*, 590 F. Supp. 2d at 610-12 (holding that common law breach of fiduciary duty claims were preempted by the Martin Act when the claims arose from the securities fraud violations).

Significantly, the only Second Circuit case to address the subject similarly recognized that common law claims involving securities are preempted by the Martin Act:

> Castellano appeals the district court's dismissal of his claim under New York state law for breach of fiduciary duty. This claim is barred by the Martin Act, New York's blue sky law, which prohibits various fraudulent and deceitful practices in the distribution, exchange, sale and purchase of securities. The New York Court of Appeals has held that there is no implied private right of action under the Martin Act, and

other New York courts have determined that sustaining a cause of action for breach of fiduciary duty in the context of securities fraud would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney-General's exclusive enforcement powers thereunder.

*Castellano v. Young & Rubicam*, 257 F.3d 171, 190 (2d Cir. 2001) (internal citations and quotation marks omitted).

Plaintiff's only response to this line of authority arises in a footnote, which observes that a recent decision in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354 (S.D.N.Y. 2010), questioned Martin Act preemption on the basis of statutory interpretation and legislative history. (*See* Pls.' Opp'n 24-25 n.12.) However, as this and other courts, have noted in declining to follow *Anwar*, "unless and until the New York Court of Appeals adopts such a rule, this Court is bound to apply the result in the only Second Circuit case to address the subject of Martin Act preemption, *Castellano v. Young & Rubicam*." *Wachovia*, 753 F. Supp. 2d at 380-81; *accord In re Kingate Mgmt. Ltd. Litig.*, No. 09 Civ. 5386 (DAB), 2011 WL 1362106, at *11 (S.D.N.Y. Mar. 30, 2011).

Plaintiff's New York residence and his New York venue allegations, (Compl. ¶ 27; *id.* Ex. A), make the Martin Act applicable here. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 610 n.9 (S.D.N.Y. 2008) (finding Plaintiff's residency in New York and New York venue allegations "sufficient for the Martin Act to apply"). Consistent with claims "routinely dismiss[ed]" as preempted by the Martin Act, Plaintiff's breach of fiduciary duty and unjust enrichment claims plainly sound in fraud or deception, but do not require pleading or proof of intent. *Barron*, 2010 WL 882890, at *5. Indeed, these claims simply reincorporate the securities fraud allegations premised on Defendants' options backdating scheme. Accordingly, Plaintiff's claims are "exactly of the kind routinely dismissed as preempted" by the Martin Act. *Beacon Assocs. Litig.*, 745 F. Supp. 2d at 434.

2. Standing

Even if Martin Act preemption did not apply, because the state law claims are essentially derivative, Plaintiff lacks standing to bring them. As Take-Two is a Delaware corporation, the question of whether these claims are direct or derivative is governed by Delaware law. *See Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009) ("[W]hether the action is properly classified as derivative or direct is ordinarily determined by state law."). Under Delaware law, whether a claim is direct or derivative "turn[s] solely on the following questions: '(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).'" *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 314-315 (S.D.N.Y. 2010) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). "In order for a claim to be direct, plaintiff must allege that 'the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation*.'" *Diana Allen Life Ins. Trust v. BP P.L.C.*, 333 F. App'x 636, 638, 2d Cir. 2009) (quoting *Tooley*, 845 A.2d at 1033 (emphasis in original)).

The alleged harm here concerned the diversion of Take-Two funds towards the payment of illicit stock options to Company insiders, an action for which the Company suffered harm and would receive the benefit of any recovery. Indeed, two derivative actions premised on these claims have already been brought and resolved in this District. *See In Re Take-Two Interactive Software, Inc. Derivative Litig.*, No. 06 Civ. 05279 (LTS), Doc. Nos. 182-186 (voluntarily dismissing the action with prejudice); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06 Civ. 688 (RJS), 2010 WL 3958803 (S.D.N.Y. Sept. 8, 2010) (granting motion to dismiss with prejudice). Plaintiff has not attempted to file his claim derivatively and has not complied with the relevant requirements of such an action; nor does he have standing to do so as a non-shareholder. *See Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984) ("A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."). For this additional reason, Plaintiff's state law claims are dismissed.

D. Dismissal with Prejudice

Perhaps conscious of the fact that the sufficiency of this Complaint rises and falls on its ability to plead loss causation through largely undisputed facts, Plaintiff does not seek leave to replead in the event this motion is granted. Even had Plaintiff made such a request, in light of the fundamental deficiencies in Plaintiff's loss causation theory, the Court would deny it as futile. *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)."); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 272 (2d Cir. 1996) ("[F]utility is a 'good reason' to deny leave to amend."). Accordingly, the Complaint is dismissed with prejudice.

III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED and the Complaint is dismissed with prejudice. The Clerk of the Court is respectfully directed to terminate the motions located at document numbers 24, 26, and 29 and close this case.[11]

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2011
New York, New York

* * *

Plaintiff is represented by Sandy A. Liebhard, Uri S. Ottensoser, and Joseph R. Seidman of Bernstein Liebhard, LLP, 10 East 40th Street, 22nd Floor, New York, NY 10016.

Defendant Take-Two is represented by Ada F. Johnson, John B. Missing, and John V. Ponyicsanyi of Debevoise & Plimpton LLP (DC), 555 13th Street, N.W., Washington, DC 20004, and Colby A. Smith of Debevoise & Plimpton, LLP (NYC) 919 Third Avenue, 31st Floor, New York, NY 10022. Defendant Ryan Brant is represented

[11] As required by the PSLRA, the Court also finds that the parties and counsel in this matter have complied with Rule 11(b). *See* 15 U.S.C. § 78u-4(c)(1); *Rombach*, 355 F.3d at 178 ("The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'" (citation omitted)).

by Gary S. Klein and Brian A. Daley of Sandak Hennessey & Greco, LLP 707 Summer Street, Stamford, CT 06901. Defendant Todd Emmel is represented by Andrew C. Hruska and Louisa B. Childs of King & Spalding LLP, 1185 Avenue of the Americas New York, NY 10036. Defendant Robert Flug is represented by Stephen Ehrenberg of Sullivan and Cromwell, LLP, 125 Broad Street, New York, NY 10004. Defendant Oliver Grace is represented by Charles A. Stillman, Michael J. Grudberg, and Nathaniel I. Kolodny of Stillman, Friedman & Shechtman, P.C. 425 Park Avenue New York, NY 10022.

# Take-Two's Daily Stock Price* And Alleged Misstatements During Plaintiff's "Individual Action Period**" (3/4/2004 - 7/16/2006)

1. Press Release Announcing 1Q 2004 Financial Results (3/4/2004)
2. 1Q 2004 10-Q Filed With The SEC (3/16/2004)
3. Press Release Announcing 2Q 2004 Financial Results (6/8/2004)
4. 2Q 2004 10-Q Filed With The SEC (6/14/2004)
5. Press Release Announcing 3Q 2004 Financial Results (9/9/2004)
6. 3Q 2004 10-Q Filed With The SEC (9/14/2004)
7. 2004 Form 10-K Filed With The SEC (12/22/2004)
8. Press Release Announcing 1Q 2005 Financial Results (3/3/2005)
9. 1Q 2005 10-Q Filed With The SEC (3/10/2005)

* Stock price is based on Take-Two's daily close price, adjusted for the 3:2 split that occurred on April 15, 2005.

** Individual Action Period was defined by the Plaintiff in his Complaint at ¶ 3.

